YAZOO & MISS. VALLEY R. R. CO. v. A. MARX & SONS

———

(June 8, 1931. Opinion and Decree.)
(July 1, 1931. Opinion and Decree on Rehearing.)

———

Lemle, Moreno & Lemle, of New Orleans, attorneys for plaintiff, appellant.

Neil A. Armstrong, Jr., and L. F. Daspit, of New Orleans, attorneys for defendants, appellees.

BOATNER, J., ad hoc. A shipment of what was billed as "pig-lead" was made from a point in Texas to the defendants in New Orleans. It originated on the New Orleans, Texas & Mexico Railroad, which, having no line into New Orleans, turned the goods over to the Yazoo & Mississippi Valley Railroad en route, under a contract between the two railroads, and delivery was made by the latter.

On arrival of the shipment the defendants objected to its classification as pig-lead, contending that it was scrap-lead, which took a lower freight rate. They furnished proof to the officers of the Yazoo & Mississippi Valley Railroad in New Orleans that the lead had been used by their vendors in sheets to line tanks, and, having been discarded, was melted down and cast into small bars for convenience in handling, and that in this form it was sold to the defendants as scrap lead. On this showing the local representatives of the railroad yielded to the defendants' contention and collected freight at the lower rate.

Afterwards these officers were overruled by higher railroad authority and were directed to collect the deficit at the pig-lead rate. The defendants refused to pay and this suit resulted.

The court a qua, after overruling exceptions of no cause of action and prescription, gave judgment for the defendants, and the plaintiff appealed.

The bill of lading reads as if the initial carrier, the New Orleans, Texas & Mexico Railroad, was also to make delivery, and it is argued that the Yazoo & Mississippi Valley Railroad, which actually made delivery, did so in the capacity of agent of the other railroad and not as a carrier, and that it is not entitled as delivering carrier to demand payment of the freight. The distinction, if it has any reality, should make no difference, particularly since prior to the suit the Yazoo & Mississippi Valley Railroad settled with the other carrier on the basis of the pig-lead rate and the recovery asked here is solely for its own account. Clearly the cause of action belongs to the plaintiff, and the exception of no cause of action was properly overruled by the judge a quo, and the suit having been brought on behalf of the plaintiff within the prescriptive period, the exception of prescription was also properly held to be unfounded.

Of course, errors of railroad agents in the construction of tariffs do not make estoppel and cannot affect the right, which is also the duty, of the railroad to demand the true rate. The only question to be determined here is whether the defendants' goods were "pig-lead" or "scrap-lead" in the sense of the freight tariff.

It appears to be a fact that the form in which the lead was shipped is that which is commonly spoken of as "pig-lead," that is, in small bars roughly cast; but it is true, too, that the lead itself was used and discarded metal, not "virgin," that it must be melted and refined before it can be used again, and that it is of considerably less value than "virgin" lead. It is contended that it is these facts, not the mere form in which the material was cast, which are important in determining its classification.

The tariffs do not define the terms, and we are referred to no case which does. In the dictionaries we find the following:

Standard: "Pig. An oblong mass of metal cast in a rough mold, usually in sand. * * * A 301-pound mass of lead. * * * All-mine pig. Iron smelted entirely from mine material."

Century: "Pig. An oblong mass of metal which has been run while still molten into a mold excavated in sand; specifically iron from the blast furnace run into molds excavated in sand. All-mine pig, pig-iron smelted entirely from ore or mine material."

Webster: "Pig. * * * 6. Metal. (a) An open sand casting of metal, now esp. of iron or lead, run directly from the smelting furnace."

And in 48 C. J. 1180, the following:

"Pig-iron. * * * The term was derived from the shape which the iron assumed in the sand beds in which it was first cast; and when first used had reference to a particular shape or form. It has since acquired a larger meaning, and as used at present includes any product of the blast furnace that is cast in any convenient form or shape without reference to what that form or shape may be."

The production of lead is analogous to that of iron and pig-lead is the same as pig-iron with the metal changed. Some of the definitions include the idea of production in a blast-furnace, that is, from the ore; but we find also definitions of all-mine pig as composed, by way of distinction, entirely of mine materials. It would seem, therefore, that in their references to production in the blast furnace the lexicographers meant rather to describe the usual process than to define the product. The characteristic which is predominant and which suggests the name is the form, likened to that of a small hog.

The making up of freight tariffs is a highly practical matter, for they are to be used and applied by merchants and railroaders, generally the most practical of men. There is more than ordinary need to give the language of a tariff its obvious meaning, and to avoid refinements of construction which would require technical knowledge to understand and apply it.

The average man has no difficulty in distinguishing between pig-lead and scrap-lead by sight. If classification for rating depends on origin, whether directly from the ore or from junk, the rate man must stop to take and consider evidence, and it may be, to make physical and chemical investigations. It is not reasonable to suppose that for the application of freight tariffs aids of those sorts should be required.

We think we must hold that lead in pigs is pig-lead, and that it is immaterial whether it is produced from lead ore or from scrap-lead.

Accordingly, the judgment appealed from is annulled and reversed, and there is now judgment in favor of the plaintiff, Yazoo & Mississippi Railroad Company, against the defendants, A. Marx & Sons, Inc., in the sum of $200.56, with legal interest from judicial demand and all costs of both courts.

JANVIER, J., takes no part.

———

ON APPLICATION FOR REHEARING

PER CURIAM. The application is not considered because filed too late. O. K. Realty Co. v. John A. Juliani, Inc., 157 La. 277; Valmont Service Station v. Eug. B. Avegno et al., 3 La. App. 336.