**SONKEN–GALAMBA CORPORATION, a corporation, Appellant,**

v.

**Guy A. THOMPSON, Trustee, Missouri Pacific Railroad Company, Debtor, Appellee.**

**Nos. 5016, 5017.**

United States Court of Appeals Tenth Circuit.

July 25, 1955.

Rehearing Denied Aug. 24, 1955.

Harry L. Jacobs, Kansas City, Mo., and N. E. Snyder, Kansas City, Kan. (Robert J. Coleman, Kansas City, Mo., was with them on the brief), for appellant.

Ralph M. Hope, Wichita, Kan. (W. F. Lilleston, Wichita, Kan., and Williard L. Phillips, Kansas City, Kan., were with him on the brief), for appellee.

Before BRATTON and MURRAH, Circuit Judges, and WALLACE, District Judge.

WALLACE, District Judge.

These two actions,[1] consolidated for trial, were instituted by appellee, Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, Debtor (herein referred to as Trustee) to recover for the difference between certain freight rates actually paid by the appellant, Sonken-Galamba Corporation, a corporation (herein referred to as Shipper) and the rates allegedly applicable for shipments over Trustee's railroad and connecting railroad. From adverse verdicts and judgments the Shipper appeals.

Concededly, there is no substantial conflict in the pertinent facts. The shipped material consisted of pieces of

1. Nos. W–245 and KC–261 in the district court.

wrecked or obsolete aluminum airplane parts which were procured from various places in the United States and Europe and which were melted down into masses or lumps in shapes roughly resembling ingots, pigs or slabs. These pieces of aluminum scrap were melted in the field in crude furnaces operated by unskilled labor and the process was in no way metallurgically controlled. After such melting the material did not conform to any established commercial specification or any standard chemical composition and was contaminated with dirt and foreign metals, rendering it unfit for forging, rolling or making of any finished aluminum articles, and having value for remelting purposes only to recover the elementary, base metals, and was generally only used by aluminum smelters as part of the material to make aluminum ingots of specified commercial standards.

The single issue is whether for freight tariff purposes the shipped material should be deemed "scrap aluminum",[2] or whether such material should take the higher rate applicable to "aluminum ingots, pigs or slabs".[3]

The shipper urges that the instant shipments cannot be deemed to fall under the higher tariff provided for "aluminum ingots, pigs or slabs" inasmuch as the express wording of such provision requires that in order to be classified thereunder the aluminum material must unqualifiedly be "commercially known as * * * ingots, pigs or slabs", as distinguished from aluminum material that might be qualifiedly or in a loose trade sense be referred to as ingots, pigs or slabs merely because they physically resemble commercial ingot, pig or slab. In this regard the Shipper argues that aluminum *commercially* known as ingots,

pigs or slabs has reference only to aluminum ingots, etc., suitable for forging, rolling, casting, etc., to make useful aluminum articles, produced by metallurgically controlled processes, of chemical composition complying with established standards and specifications, identified by appropriate nomenclature, of uniform content and forms and free from contamination; and, does not refer to these contaminated masses of aluminum having value only for remelting for the recovery of the base metal content.

Two separate and independent reasons exist why appellant Shipper's appeal must fail.

First, it is a strained construction to insist that the descriptive clause of the freight tariff provision "commercially known as billets, blooms, ingots * * *" is a clause of limitation and that as such only applies to ingots which as a matter of chemical content can immediately be used in finished aluminum products without further smelting. By its express terms, the tariff schedule applies to ingots, pigs or slabs weighing 15 pounds or more, not further finished than hot rolled, rough hot extruded, rough hot pressed or rough hot hammered and not smooth, nor surface finished. Any commodity meeting such specifications comes within the schedule. The words "commercially known as * * * ingots, pigs, or slabs" as they appear in the context of the schedule are merely an affirmation that ingots, pigs, or slabs of the size and processed in the manner detailed in the schedule are commercially known as ingots, pigs, or slabs. It does not prescribe or fix commercial knowledge as an essential element or requirement to bring the commodity within the scope and purview of the schedule.[4]

2. The aluminum ingot, pig and slab classification in the tariff provides: "1570— Aluminum: Billets, blooms, ingots, pigs or slabs, See Notes 1 and 2, Items 1575 and 1576, loose (LCL, only if weighing each 15 lbs. or over) or in packages." 1575—Note 1 states: "Ratings apply only on material not further finished than hot rolled, rough hot extruded, rough hot pressed or rough hot hammered and

not smooth, nor surface finished, commercially known as billets, blooms, ingots, pigs or slabs."

3. The aluminum scrap classification in the tariff reads: "Scrap, aluminum (see Note 1.)" Note 1 provides: "includes only pieces (separate or combined) having value for remelting purposes only."

4. Cf. Yazoo & M. V. R. Co. v. A. Marx & Sons, 1931, 17 La.App. 172, 135 So.

Secondly, even if the tariff provision in question be interpreted as requiring all goods within its purview to be "commercially known as" ingot, pig or slab, the evidence of record is overwhelming that the goods in controversy were in common business terminology so regarded. Although the aluminum in question was not of the purity and general quality to be readily usable for finished aluminum products without further smelting and was inferior to ingots treated by control smelting, such does not alter the fact that the shipped goods in their melted down form, were commercially regarded and referred to as ingots, pigs or slabs, as distinguished from "Scrap, Aluminum".[5]

Although there have been no prior court rulings dealing with this exact problem, a number of Interstate Commerce Commission decisions have rejected arguments of the type posed by the Shipper that due to the origin and value of the shipments in question, the goods should be classified as "Scrap, aluminum" even though melted into "ingot" form.[6] These I.C.C. decisions, although not binding on this Court, certainly are persuasive;[7] and, even though some slight factual distinctions exist between such decisions and the case at bar, insofar as the basic rationale is concerned the distinctions are without legal significance.

Although the appellant urges error in connection with the manner in which the jury arrived at a verdict for the Trustee,[8] this asserted error will not

---

64, 65, 675, where the Louisiana court in dealing with an analogous problem as to whether certain goods were "pig-lead" or "scrap-lead" remarked: "The making up of freight tariffs is a highly practical matter, for they are to be used and applied by merchants and railroaders, generally the most practical of men. There is more than ordinary need to give the language of a tariff its obvious meaning, and to avoid refinements of construction which would require technical knowledge to understand and apply it. The average man has no difficulty in distinguishing between pig-lead and scrap-lead by sight. If classification for rating depends on origin, whether directly from the ore or from junk, the rate man must stop to take and consider evidence, and it may be, to make physical and chemical investigations. It is not reasonable to suppose that for the application of freight tariffs aids of those sorts should be required."

5. Although the Shipper introduced expert testimony that in technical commercial aluminum parlance goods of the character in question were deemed "scrap" as distinguished from "ingots, pigs or slabs", the evidence in its entirety demonstrates beyond question that as a practical matter these shipments were commercially treated, designated, named and considered by all parties handling them, including the Shipper itself, as ingots, pigs and slabs. Such evidence includes bills of lading, correspondence, invoices, contracts and sales confirmations. Parenthetically, it is well to note that the

instant problem involving freight transportation must be distinguished from the one encountered by the Commissioner of the United States Customs wherein he had to determine whether the merchandise should be entered as scrap aluminum, free of duty, or dutiable *crude* aluminum.

6. See Esperado Mining Co. v. Atchison, T. & S. F. Ry. Co., 278 I.C.C. 183; Samuel Greenfield Co., Inc., v. New York Central R. Co., 288 I.C.C. 59; Apex Smelting Co. v. New York Central R. Co., 288 I.C.C. 78; American Smelting & Refining Co. v. Grand Trunk W. R. Co., 288 I.C.C. 383. And, as mentioned in Brown & Brown v. B. & M. R. R., 266 I.C.C. 310, 312: "The Commission consistently has found that it is the character of an article from a transportation standpoint, and not the use to which it shall be put, that determines the rate or rating applicable."

7. Read Empire Refining Co. v. Davis, D.C. Okl.1925, 6 F.2d 305. As observed in Updike Grain Corporation v. St. Louis & S. F. Ry. Co., 8 Cir., 1931, 52 F.2d 94, 96: "While the decisions of the Interstate Commerce Commission are not conclusive here, they are of great weight. They are especially persuasive in this highly technical field of rate construction and rate interpretation."

8. Appellant urges that the jury was guilty of prejudicial misconduct in sending for a dictionary; in receiving a dictionary and in ascertaining therefrom the meaning of the words "ingots" and "combined".

be discussed inasmuch as these cases should never have gone to the jury. The determinative issue in both of the instant suits was one of law which should have been passed on by the court.

Inasmuch as the trial court entered judgments for the Trustee,[9] and since such results are correct as a matter of law, the judgments of the trial court are hereby affirmed.

---

9. Judgments were entered based upon the special verdict rendered by the jury (in both cases) finding that the materials in question fell within the "aluminum ingot, pig and slab" classification; and, not within the "Scrap, aluminum" section.