**ROACH APPLETON MANUFACTURING COMPANY, a Delaware Corporation, Plaintiff,**

**v.**

**UNITED STATES of America, and Interstate Commerce Commission, Defendants.**

**No. 66 C 821.**

United States District Court N. D. Illinois, E. D.

Jan. 27, 1967.

Frank Covey, Jr., Howard Pizer, Chicago, Ill., for plaintiff.

Edward Hanrahan, U. S. Atty., Chicago, Ill., for the United States.

Robert Ginnane, Gen. Counsel, John E. Faulk, Washington, D. C., for the Interstate Commerce Commission.

J. W. McFadden, Chicago, Ill., for intervening defendant Clemans Truck Lines.

Bryce Rea, Jr., Edward Hummer, F. G. Freund, Washington, D. C., for intervening defendant National Motor Freight Traffic Association.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

Petition for Review of Final Order of I.C.C.

This action is an appeal from a decision of the Interstate Commerce Commission. It is brought under 28 U.S.C. Sec. 1336, and 5 U.S.C. Sec. 1009, by Roach Appleton Manufacturing Company ("Roach"), to set aside and annul the decision and order of the Commission of October 18, 1965, which was entered by the Rates and Practices Review Board, in Docket No. 34550. The decision, with several changes, adopted the report and order of Hearing Examiner Luttrell, of May 24, 1965, in favor of defendants. On January 10, 1966, Division 2 of the Commission, acting as an Appellate Division, denied plaintiff's petitions for reconsideration and for further hearing and cross-examination. On February 8, 1966, the Commission denied plaintiff's petition for a finding that an issue of general transportation importance was involved in the proceeding. This appeal followed.

Subsequent to the filing of the complaint herein, the following parties were granted leave to intervene as defendants: National Motor Freight Traffic Association, Clemans Truck Line, Inc., ("Clemans"), Commercial Motor Freight Inc., of Indiana, Courier-Newson Express, Inc., and Tucker Freight Lines ("Tucker"). All of the intervening defendants were parties of record to the proceeding before the Commission.

On January 25, 1965, Roach filed with the Commission its complaint against Clemans and Tucker, alleging a violation of Sec. 217(b) of the Interstate Commerce Act, 49 U.S.C. Sec. 317(b), in that the above named carriers had applied an improper and inapplicable tariff classi-

fication to its shipments of "switch boxes". The freight charges, which had been partially prepaid by Roach, were based upon the classification described in the National Motor Freight Classification (NMFC) A-7, MF-I.C.C. 5, Items 63160 and 63200, which produce a less-than-truckload (LTL) rating of class 70, and a truckload (TL) rating of class 40. Plaintiff contended before the Commission and now contends before this Court that its shipments were overcharged to the extent that the charges exceeded those based on ratings of Class 60 (LTL), and Class 35 (TL), as prescribed in Item 61057 of MF-I.C.C. 5, which plaintiff asserts should have been the proper classification for these shipments.

■ Items 63160 and 63200, which are general classification descriptions apply to:

> "Switch Boxes, Conduit Outlet Boxes, or Junction Boxes or Cabinets, with or without fittings or covers; or Outlet Box Covers, other than outlet box plates; See Note Item 62682 (63160)
>
> \* \* \* \* \* \*
>
> Steel, NOI, in packages, also Steel Junction Boxes or Cabinets, loose." (63200)

Item 61057, a specific classification description applies to:

> "Boxes, Switch or Conduit Outlet Box Covers, other than outlet box plates, *14 gauge steel or thicker,* plain primed or galvanized, outside measurement of boxes not exceeding 12 united inches (length, width, and depth added), with or without fittings or covers, see Note, Item 62682;—in packages" (emphasis added).

It is axiomatic that an article must be classified under a general description if it does not fall within a specific description. See American Lithographic Co. v. Lehigh Valley RR, 101 I.C.C. 100 (1925). Thus since Item 63200 applies to shipments of plaintiff's switch boxes, the higher rates were properly assessed unless these shipments can be brought within the requirements of Item 61057.[1]

It is admitted by all parties that plaintiff's switch boxes comply with the requirements of Item 61057 in all specifications except one—that being the crucial issue of this case—whether plaintiff's switch boxes are made from 14 gauge steel within the meaning of Item 61057.

The steel used by plaintiff, has a decimal thickness of no less than .0710 inches, after allowing for the normal variations in thicknesses of sheets from middle to edge, variations resulting from rolling at the mills and from plaintiff's stamping processes. It was testified that plaintiff's steel runs from .070 to .074 inches, with a target thickness of .0710 inches.[2] The higher and lower thicknesses result from the variations referred to above.[3]

The Commission concluded that plaintiff's boxes were not made of 14 gauge steel. It held that under the provisions of Rule 5, Sec. 16, and Footnote A to Sec. 16 of NMFC A-7, MF-I.C.C. 5, steel with a thickness of less than .0749 inches is not 14 gauge steel.

Rule 5, Sec. 16 provides, in pertinent part:

> "Unless otherwise provided, where reference is made to gauge, it means U. S. Standard Gauge shall be used for determining thickness of sheet or plate steel; \* \* \* Where classification

---

1. Since the final determination by the Commission on February 8, 1966, Item 61057 has been revised by the National Classification Board. This revision has eliminated any reference to gauge from Item 61057. Because of this change in Item 61057, there is no dispute as to the proper classification of plaintiff's ship- ments since July 12, 1966, and the impact of this appeal is limited to shipments made before that date.

2. Statement of E. C. Fox, p. 26; Complainants Exhibit 4.

3. Statement of Nathan Rudolph, p. 16.

provisions are based on gauge and where only thickness is available, the table in Footnote A must be used to convert thickness to comparable gauge."

Footnote A provides, in part:

| "Gauge Number | Nominal Thickness in Decimals of an Inch United States Standard (Revised) U.S.S.G. |
|---|---|
| * * * | |
| 14 | .0749 |
| * * *" | |

———◆———

The Commission concluded from this that to be classified under Item 61057, switch boxes must be made of steel having a thickness *of no less* than .0749. Plaintiff contends that steel which is no less than .0710 inches and no more than .0821 inches thick is 14 gauge steel, and that since plaintiff's switch boxes are made of steel no less than .0710 inches thick (except for minor variations as to which there is no dispute in this appeal), they are made of 14 gauge steel and should be classified under Item 61057.

It is not disputed that under the Manufacturers Standard Gauge, which is the standard exclusively used and accepted in the industries which deal with steel products, the steel used by plaintiff would be considered 14 gauge. This is so because under that standard, the thickness ordering limits are .0821 to .0710 inches.[4] Apparently then, under the prevailing industry standards, .0710 inch steel is considered to be 14 gauge steel.

■ However, our duty is to construe the applicable tariff provisions which refer to U. S. Standard Gauge. And we must respect the Commission's decision unless we find it to be unsupported by "substantial evidence." United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946). The U. S. Standard Gauge was enacted in 1892, as the official standard for measuring sheet and plate iron and steel. It is a weight gauge based on weight per square foot in pounds avoirdupois. But the approximate thicknesses for each gauge number were calculated from the density of wrought iron, which is about 2% lighter than the density of steel. As a result the manufacturers of sheet steel adopted a new gauge known as the Manufacturers Standard Gauge. The gauge numbers and corresponding weights in this gauge are identical to those contained in the U. S. Standard Gauge, but the equivalent thicknesses are less since they are based on the density of steel, not that of wrought iron, thereby eliminating any confusion in converting from weight to thickness. The U. S. Standard Gauge is now apparently considered to be obsolete within the steel industry.

Rule 5 states that when reference to gauge is 'made, U. S. Standard Gauge shall be used for determining the thickness of steel. Since U. S. Standard Gauge is based on weight, and the tariff item refers to gauge based on thickness ("14 gauge steel or thicker"), it is necessary to convert from weight to thickness to arrive at the decimal thickness for U. S. Standard Gauge. It is for this purpose that Footnote A is supplied. The Hearing Examiner relied on Footnote A to support his conclusion that U. S. Standard Gauge is the only relevant measurement to be used for determining "14 gauge".

However, Footnote A refers to U. S. Standard Gauge (*Revised*). It is also clear from the statute and the record

4. See Hearing Examiner's Report, page 6.

that the U. S. Standard Gauge set forth in 15 U.S.C. Sec. 206, has never been revised.

Consequently, plaintiff contends that U. S. Standard Gauge (Revised) is in fact Manufacturers Standard Gauge, and since .0710 steel is considered to be 14 gauge steel under the latter standard, the Commission erred in holding that steel with a thickness *less than* .0749 is not 14 gauge steel. Plaintiff supports this contention by comparing the figures in U. S. Standard Gauge, U. S. Standard Gauge (Revised), and Manufacturers Standard Gauge, in Appendix H to its brief.[5] It is easily seen from that table

5.

### APPENDIX H

Comparison of U.S. Standard, U.S. Standard (Revised)
and Manufacturers Standard Gauges

#### APPROXIMATE THICKNESS IN

#### DECIMALS OF AN INCH

| Gauge | U.S. Standard Gauge | U.S. Standard Gauge (Revised) (Footnote A) | Manufacturers Standard Gauge |
|---|---|---|---|
| 1 | .28125 | | |
| 2 | .265625 | | |
| 3 | .25 | .2391 | .2391 |
| 4 | .234375 | .2242 | .2242 |
| 5 | .21875 | .2092 | .2092 |
| 6 | .203125 | .1943 | .1943 |
| 7 | .1875 | .1793 | .1793 |
| 8 | .171875 | .1644 | .1644 |
| 9 | .15625 | .1494 | .1495 |
| 10 | .140625 | .1345 | .1345 |
| 11 | .125 | .1196 | .1196 |
| 12 | .109375 | .1046 | .1046 |
| 13 | .09375 | .0897 | .0897 |
| 14 | .078125 | .0749 | .0747 |
| 15 | .0703125 | .0673 | .0673 |
| 16 | .0625 | .0598 | .0598 |
| 17 | .05625 | .0538 | .0538 |
| 18 | .05 | .0478 | .0478 |
| 19 | .04375 | .0418 | .0418 |
| 20 | .0375 | .0359 | .0359 |
| 21 | .034375 | .0329 | .0329 |
| 22 | .03125 | .0299 | .0299 |
| 23 | .028125 | .0269 | .0269 |
| 24 | .025 | .0239 | .0239 |
| 25 | .021875 | .0209 | .0209 |
| 26 | .01875 | .0179 | .0179 |
| 27 | .0171875 | .0164 | .0164 |
| 28 | .015625 | .0149 | .0149 |
| 29 | .0140625 | .0135 | .0135 |
| 30 | .0125 | .0120 | .0120 |
| 31 | .019375 | .0105 | .0105 |
| 32 | .01015625 | .0097 | .0097 |
| 33 | .009375 | .0090 | .0090 |
| 34 | .00859375 | .0082 | .0082 |
| 35 | .0078125 | .0075 | .0075 |
| 36 | .00703125 | .0067 | .0067 |
| 37 | .006640625 | .0064 | .0064 |
| 38 | .00625 | .0060 | .0060 |

that the figures in U. S. Standard Gauge (Revised) as used in the tariff bear no resemblance whatever to U. S. Standard Gauge as set forth in 15 U.S.C. Sec. 206, but are exactly the same as those in the Manufacturer's Standard Gauge, with exceptions only in gauges 9 and 14. The exceptions deviate only by .0001 and .0002 inches respectively, which plaintiff attributes to typographical errors.

Intervening defendants deny that the deviations are typographical errors. In their brief, they assert that when the National Classification adopted the U. S. Standard Gauge (Revised) table in 1959, it used as its source the "Engineering Handbook", Limited Edition, Eleventh Printing, Hyatt Bearings Division, General Motors Corp. (1951). That handbook lists in table form a standard entitled "U. S. Standard (Revised) U.S. S.G.", showing the exact decimal thicknesses shown in Footnote A. Since Footnote A's figures were taken from the handbook, the intervenors insist that Footnote A does not refer to Manufacturer's Standard Gauge with typographical errors, but to U. S. Standard Gauge (Revised) without error.

In rebuttal, plaintiff produces a letter from Mark Otterbein, a staff engineer at Hyatt Bearings who was involved in the preparation of the original editions of the handbook. Mr. Otterbein wrote:

" * * * Upon review of that table, it would appear that the column entitled 'United States Standard (Revised) U.S.S.G.' refers to the approximate thickness equivalents which are commonly known as 'Manufacturer's Standard Gauge'. The variations from Manufacturer's Standard Gauge appearing in gauges 9 and 14 appear to be typographical errors. We have nothing in our files to indicate that .0749, rather than .0747, was consciously chosen to represent 14 gauge."

■ Defendants attempt to strike the letter on the ground that it was not in the record before the I.C.C. Although normally, evidence should not be received by a reviewing court without having first been introduced in the proceedings below, in view of the disposition which we will make of this case, and since the letter is not decisive in our judgment, a ruling on the objection need not be made at this time. Furthermore, in these circumstances, admission of the letter may well be proper since it was used only to rebut an argument made for the first time by defendants in their brief in this proceeding.

■ In the Court's judgment, after consideration of the entire record herein, we believe the evidence tends to support the view that Footnote A has adopted Manufacturer's Standard Gauge under the heading U. S. Standard Gauge (revised).

Although the Manufacturer's Standard Gauge lists .0747 (or .0749) inches as the thickness of 14 gauge steel, it is undisputed that the thickness range for 14 gauge steel under that standard is .0821–.0710. Defendants insist that the only relevant figure is the one listed on the table as equivalent to 14 gauge steel, i. e. .0749. They argue the industry purchasing range is irrelevant to tariff classification considerations.

It is true that there was no attempt made in the Classification to establish manufacturing or industrial standards. But it seems to this Court that in the present circumstances, and in view of the record as a whole, where the plaintiff admittedly uses 14 gauge steel under industry standards, it would be error to uphold a finding that it does not use 14 gauge steel within the meaning of Item 61057. We believe that the evidence shows that the standard utilized by the Hearing Examiner was in reality Manufacturer's Standard Gauge, under which plaintiff's steel is considered to be 14 gauge.

Furthermore, in his ruling, the Hearing Examiner stated the following: (at p. 7 of his decision)

"Therefore, Item 61057 requires that in order to be classified in this specific classification the switch boxes must measure U. S. Standard Gauge No. 14 or thicker, or where the article to be classified is not in the normal course

of business or by custom considered to be U. S. Standard Gauge No. 14, the actual decimal thickness must be no less than .0749 inch."

Since U. S. Standard Gauge as applied by the Hearing Examiner means U. S. Standard Gauge (Revised), which in turn we think could likely mean Manufacturer's Standard Gauge, and since plaintiff's .0710 thickness is considered in the normal course of business to be 14 gauge steel under the latter standard, we think that the evidence tends to show that it qualifies as 14 gauge steel under the meaning of Item 61057, as further interpreted by the Hearing Examiner. Under his ruling, since in the normal course of business plaintiff's steel is 14 gauge steel under the standard he was applying, (U. S. Standard Gauge, thought by this Court to likely mean Manufacturer's Standard Gauge), the limitation of .0749 should probably be inapplicable.

Defendants argue that the Hearing Examiner made reference to the normal course of business in the industry with regard to the *shipping* practices, rather than to the *purchasing* practices. In addition, they assert that allowance of plaintiff's argument would create for the carriers the intolerable burden of becoming familiar with the complexities of each industry it serves, and would facilitate discrimination.

Aside from the fact that nothing in the record indicates that a separate definition of gauge for shipping purposes exists, common sense would seem to indicate that no such separate standard exists. Manufacturers most likely would not create additional and conflicting gauge systems when a single one would serve their purposes. Since defendants cite the Hyatt Handbook, an *industry* table, as the source of Footnote A, a tariff classification, our view of what the evidence reveals, gains even greater strength.

It is a general principle of tariff construction that any ambiguities in a tariff or classification are to be construed in favor of the shipper and against the carrier. See e. g. United States v. Interstate Commerce Commission, 91 U.S.App.D.C. 178, 198 F.2d 958 (1952); United States v. Missouri Pacific Railroad Co., 250 F.2d 805 (5th Cir. 1958). Since the definition of the term "14 gauge" as used in Item 61057 has been put into dispute, and since the members of the industry consider steel with a thickness of .0710 inches to be 14 gauge, the above principle of construction is applicable, although not conclusive in these circumstances.

Furthermore, we do not believe discrimination would result if the carriers were compelled to apply the generally accepted industry standards of classification.

Due to the opinion which we have stated above, we do not think the provisions of Footnote A need be consulted in this case. Even if they are applicable, it is this Court's opinion that the evidence, more likely than not shows plaintiff's steel to be within the 14 gauge requirement of Item 61057. U. S. Standard Gauge (Revised), in Footnote A, specifies a nominal thickness for 14 gauge steel of .0749 inches. In defendant's opinion, that table established a rigid decimal break and .0749 represents the minimum thickness of 14 gauge steel. But since U. S. Standard Gauge (Revised) could, in our opinion, be the same as Manufacturer's Standard Gauge, and since 14 gauge steel is considered under that classification to have a thickness range from .0710 to .0821,[6] we are reluctant to accept defendant's minimum thickness theory.

In the first place there is nothing in the record to support the conclusion that "nominal thickness" must inflexibly mean "minimum thickness." On the contrary, plaintiff has introduced evidence to show that the heading refers to

---

6. Defendants argue that the range .0710 to .0821 is a "tolerance." Plaintiff points out at page 9 of its reply brief that it is

not a tolerance but a range, since the steel companies apply a *tolerance* of .007 (over or under) in addition to this range.

"approximate thickness." The predecessor to Footnote A, in prior Rule 14½ of the National Motor Freight Classification (Appendix Q to plaintiff's brief) used the word "approximate." In addition, the Hyatt Handbook which *defendants* show to be the source of Footnote A, used the word "approximate thickness." No apparent reason has been suggested for the change from "approximate" to "nominal," but in any event we do not think the change should cause us to interpret "nominal" to mean "minimum."

Secondly, the nominal thicknesses set out in Footnote A and in the Manufacturer's Standard Gauge, are in most instances, with proper rounding, the midpoints of the relevant thickness ranges for that gauge.[7] Although .0749 (or .0747) is not the midpoint of the .0710–.0821 range, plaintiff suggests the following explanation: (at pp. 23–24 of pl. brief)

"These mid-points result from the conversion of the Congressionally established weight equivalents to the approximate thickness for steel. The only exceptions to the listed thicknesses being the mid-points of the thickness ranges for each gauge occur in gauges 14, 16, 20, 26, 31, and 36. These exceptions are, however, easily explained. In each of these several gauges, the weights set in the Congressional standard are doubled and, hence, with the doubling of the thickness difference between gauges, there is a corresponding doubling of the difference between the higher range figure and the nominal thickness point in the chart. (At 16 gauge there is also an adjustment of 20% per .0015 of an inch). These jumps in the thicknesses are explained by examining Appendix S which is a chart of the differences between weights used in the U. S. Standard Gauge as established by Congress in 15 U.S.C. Sec. 206. It can be seen that the doubling of the weight differences and the

20% adjustment (at 16 gauge) occur at the same places in the Congressional standards as in the Manufacturers Standard Gauge. With the exception of those gauges where the weight differences shift, the nominal or approximate thickness shown in the Manufacturer's Standard Gauge are the mid-points of the ranges. (See Appendix R).

If the gauge involved in Item 61057 had been other than one located at the 'shift' point between weight differences, there probably would have been no confusion. It would then easily have been seen that thickness shown in Footnote A was, in fact, the mid-point in the thickness range for that particular gauge. Since 14 gauge is a shift point, however, the nominal or approximate thickness is not the mid-point in the range but rather is a point roughly one-third of the way through the range."

 Finally, plaintiff illustrates the distortion which would result from adopting defendants' theory of minimum thickness: (pl. br. p. 22)

"By the use of this 'minimum' definition, the Commission would interpret 14 gauge as including anything more than its 'nominal' thickness and less than the nominal thickness of 13 gauge. 14 gauge according to this interpretation would run from .0747 (incorrectly stated as .0749) to .0896. (The nominal thickness of 13 gauge being .0897). Since the thickness range of 13 gauge is actually .0822 to .0971, this rule would classify light 13 gauge steel, i. e. from .0822 to .0896 as 14 gauge steel \* \* \* 14 gauge is universally considered to range from .0710 to .0821, but by setting the *nominal* thickness of .0747 as the *minimum* thickness, all steel from .0710 to .0746 must fall in 15 gauge, for which the high end of the thickness range is .0709. No one in the industry would consider steel .0896 as 14 gauge, or steel .0746 as 15 gauge,

7. See Appendix R to plaintiff's brief.

576

yet this is precisely what the Commission's definition of gauge would require."

On the basis of the foregoing arguments we are of the opinion that the nominal thickness as set forth in Footnote A is no more than a measure of approximate thickness, and should not be interpreted to be a minimum thickness as defendants contend. Instead, we believe, on the basis of the evidence that nominal thickness should be interpreted to include the generally accepted range for 14 gauge steel, which undisputedly includes plaintiff's .0710 steel.

■ It follows from the above that we do not consider the decision of the Commission to be based upon "substantial evidence" in concluding that plaintiff's steel is not 14 gauge within the meaning of Item 61057.

Defendants aver that plaintiff should not be allowed to make the arguments as to the identity of U. S. Standard Gauge (Revised) and Manufacturer's Standard Gauge, and the issue of the ambiguity of "gauge" as used in the tariff, because they were not made before the Commission. They also object to the introduction of several of the appendices to plaintiff's brief-in-chief and to Otterbein's letter on the same ground. Plaintiff points out that the disputed appendices either were introduced or referred to in the Commission proceedings, or are compilations based upon evidence submitted to the Commission.

Although defendants cite Wycoff Co. v. United States, 240 F.Supp. 304 (D. Utah 1965), for the general proposition that District Court review of Commission proceedings is not *de novo*, that case also stated:

" * * * *ordinarily* it is improper to allow the Commission's findings to be attacked or supported in court *which the Commission had no opportunity of considering.*"

\* \* \* \* \* \*

"In any event, the proffered evidence was not of a character to throw into question the conclusions reached here." (240 F.Supp. at 308) (emphasis added)

■ It goes without saying that whether or not the disputed evidence or arguments were before the Commission, in our opinion, they threw into question the conclusions reached there. Furthermore, plaintiff complains that by denying their petition for a rehearing based upon additional evidence, the Commission denied to plaintiff the opportunity to introduce the disputed evidence. If, in fact, the additional evidence was not discovered until after the rendering of the Commission decision, that is true. On the facts presented here, we are unable to determine when the evidence was adduced. Nevertheless, since this evidence does cast doubt upon the Commission decision, and since the Commission apparently never considered the disputed arguments, whether it had the opportunity to do so or not, we believe plaintiff should have the opportunity to bring them before this Court.

Finally, defendants contend that in the area of rates and tariffs, courts should pay great deference to Commission findings since such findings involve the exercise of administrative expertise. See e. g. Emmons Coal Mining Co. v. Norfolk & Western Ry., 272 U.S. 709, 712, 47 S.Ct. 254, 71 L.Ed. 485 (1927); Sonken-Galamba Corp. v. Thompson, 225 F.2d 608, 610 (10th Cir. 1955), cert. den. 350 U.S. 896, 76 S.Ct. 154, 100 L.Ed. 788 (1955). We agree.

However, this case involves a question of tariff construction, which has been held by the courts to be a question of law where the construction does not involve technical words within the expertise of the Commission, Brown & Sons Lumber Co. v. Louisville & Nashville Ry., 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301 (1937), Hygrade Food Products Corp. v. Chicago, M., St. P., & P. Ry., 85 F.2d 113, 116 (2d Cir. 1936), or at least a mixed question of law and fact in the same circumstances. Baltimore & Ohio Ry. Co. v. Owens-Illinois Glass Co., 133 F.Supp. 680 (D.C.Ohio 1954).

■ This Court does not believe that the instant issue involves a question within the *exclusive* domain of the Commission's expertise, since we think the construction of "14 gauge" within the meaning of Item 61057 to be equally capable of construction by this Court or the Commission.

■ However, since the technical questions necessarily involved in determining the significance of including shipments in one classification or another are questions faced by the Commission often, and only rarely by the courts, we think the Commission should be afforded the opportunity to take another look at this case. This time, however, the Commission should consider the arguments and evidence which are part of the record before this Court, but which the Commission did not consider at the prior hearing, or which the Commission did not consider because it denied the petition for rehearing. It should also consider any relevant evidence which the plaintiff herein may yet adduce.

■ We might observe that petitions for reconsideration of Commission decisions should be carefully considered, and should not be refused without adequate justification. Certainly, if a petitioner has uncovered additional relevant evidence he should be given the opportunity to present it. A possible consequence of denying a rehearing is the possibility that a *reviewing court*, such as this one, might disagree with the Commission on the basis of evidence or arguments which the petitioner did not or could not introduce below either because the evidence was not then available or if available was denied admission.

Plaintiff urges this Court to reverse the Commission's order without remand. Nevertheless, when classification questions of this nature are presented, we think the prudent course is to remand such questions to the Commission for a reconsideration of the substantial issues presented therein. On the basis of the whole record which the Court has considered herein, we think there is ample reason for the conclusion that the

evidence favors plaintiff's arguments— namely, that the steel which they use is 14 gauge within the meaning of Item 61057, under either theory considered above. However, the Court feels that its judgment may have been influenced by evidence and arguments which the Commission did not or had no opportunity to consider. In fairness, we think the Commission should have the opportunity to review the record as it was presented here. We stress our concern that the Commission consider on remand all evidence which was not presented to it initially, or which it refused to consider, and all arguments based thereon. That does not necessarily mean that the Commission must reverse its decision to strike certain evidence offered by the plaintiff in the initial proceeding, for we do not wish to substitute our judgment over such matters. But we observe that evidentiary rules may be administered more leniently in non-jury matters such as administrative hearings.

Accordingly, we hold that the decision below is not supported by substantial evidence on the record as a whole, since that result was infected with the premise that 14 gauge steel for Item 61057 purposes can be no less than .0749 inches thick. On the basis of all the evidence we have seen, we think that premise is wrong, and in the absence of a reconsideration of the evidence, constitutes fundamental error. It is our judgment, therefore, that this cause be remanded to the appropriate Hearing Examiner for a rehearing conducted in accordance with the findings of this opinion.

We wish to make clear for the record, however, that the Hearing Examiner is free to conduct an independent re-hearing of this case. By our decision, we did not mean to make a judgment on the merits, but only to indicate our belief that the decision below was not supported by the evidence presented to us on this appeal. Armed with all of the relevant evidence and pertinent arguments, the Hearing Examiner should make an independent determination of the merits of this case. If his view of the evidence

reaffirms the initial decision made by the Commission, it will of course, again be reviewable by a District Court. But subsequent review presumably would be more limited than this Court's review, since the Commission would have considered all of the relevant evidence, which was not the case in the record before us today.