759 F.2d 676
 1985-1 Trade Cases 66,535
 Leon BARNES, as Trustee in Bankruptcy for Sterile Food
Products, Inc., a Washington corporation; and
Stayfresh Food Products, Inc., a
Washington corporation,
Plaintiffs-Appellants,
v.
ARDEN MAYFAIR, INC., a Delaware corporation, et al., Defendants,
and
Sea-Land Services, Inc., Defendant-Appellee.
 No. 84-3621.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 4, 1984.
Decided April 15, 1985.
 
 Donald H. Mullins, Schweppe, Krug, Tausend & Beezer, Seattle, Wash., for plaintiffs-appellants.
 John Lowery, Seattle, Wash., for defendant-appellee.
 Appeal from the United States District Court for the District of Alaska.
 Before WALLACE, KENNEDY and FLETCHER, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 This is an appeal from an order granting defendant Sea-Land Service, Inc.'s (Sea-Land) motion for summary judgment. Barnes is the trustee in bankruptcy for plaintiffs Sterile Food Products (Sterile) and Stayfresh Food Products (Stayfresh). They commenced this antitrust action in 1975 against various Alaska dairies (dairies) and Sea-Land, a carrier shipping the dairies' and Sterile's products to Alaska. The complaint alleged the destruction of Sterile's and Stayfresh's businesses through various unlawful conspiratorial practices in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2, and the Clayton Act, id. Sec. 14, as well as numerous pendent state law claims. The dairies entered pleas of nolo contendere in related criminal indictments and reached settlements with Sterile and Stayfresh prior to or shortly after the granting of Sea-Land's individual motion for summary judgment. We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 
 2
 * Sterile developed new methods of pasteurizing and packaging milk which dramatically enhanced its shelf life. Milk which had undergone this process was labeled "sterilized," and in the new packaging it could be kept unrefrigerated for periods of ten to twelve weeks. This product was ideally suited for the distant Alaska market. Sterile formed Stayfresh in 1972 to service Alaska, but both companies soon filed for bankruptcy.
 
 
 3
 During this period the dairies undertook various anti-competitive tactics to keep Stayfresh out of the Alaskan market. The complaint against Sea-Land alleges that the dairies enlisted Sea-Land's aid in a conspiracy to keep Sterile's product out of Alaska by manipulating the tariffs Sea-Land charged for shipping sterilized milk to Alaska. It was also alleged that a Sea-Land employee discouraged a potential purchaser of a Stayfresh distributorship from entering into an agreement with Stayfresh in furtherance of the conspiracy's goals.
 
 
 4
 Goods are shipped under one of two categories of tariffs: a broad class tariff or a specific commodity tariff. The cost of shipping is generally higher under the class tariff. Sterile originally shipped its goods directly under a class rate for milk products requiring refrigeration because there was no special commodity rate for its unique product at that time. It later began shipping indirectly through freight consolidators who shipped the goods under a special commodity tariff for grocery items (Item 850), which specifically included "milk, canned, flaked or powdered," but the definition did not include sterilized milk in paper cartons. This rate was approximately one-half the class rate. Sea-Land later determined that the Item 850 rate was not proper under applicable Interstate Commerce Commission (ICC) rules, and recovered charges from the indirect shippers.
 
 
 5
 Sterile then requested Sea-Land to issue a specific commodity tariff for its unique product; Sea-Land granted this request, which resulted in a new classification (Item 1345). Subsequently, Ben Nolan, an employee of one of the dairies, complained on numerous occasions to Sea-Land that this new rate was not cost-justified and gave Sterile an unfair advantage over the rates charged for his employer's bulk milk shipments. After reviewing its tariff schedule, Sea-Land expanded Item 1345's coverage to include certain bulk milk shipments. Although Nolan continued to complain that this was unsatisfactory, Sea-Land made no further changes in its tariffs.
 
 II
 
 6
 Sea-Land initially argues that the district court lacked jurisdiction over the claim that it conspired to illegally set its tariffs, citing Keogh v. Chicago & Northwestern Railway, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (Keogh ). In Keogh, the Court held that an action for damages consisting of the difference between rates set illegally by a conspiracy and the rates that would have been set absent a conspiracy was barred because plaintiff's sole remedy was an action before the ICC. See id. at 163, 43 S.Ct. at 49. Keogh did not, however, hold that carriers are immune from all antitrust actions, only those for which relief may be sought readily from the regulatory agency. Id. There is no per se exemption for activities of carriers beyond the control of the agency. See Georgia v. Pennsylvania Railroad, 324 U.S. 439, 455-57, 65 S.Ct. 716, 725-26, 89 L.Ed. 1051 (1945); see also Pan American World Airways v. United States, 371 U.S. 296, 313 & n. 19, 83 S.Ct. 476, 486 & n. 19, 9 L.Ed.2d 325 (1963). An action is barred only if it is plainly repugnant to the regulatory scheme established by statute. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 217-18, 86 S.Ct. 781, 784, 15 L.Ed.2d 709, modified, 383 U.S. 932, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).
 
 
 7
 Sterile and Stayfresh do not seek damages solely for an illegally-set price, as did the plaintiffs in Keogh. Rather, they claim a conspiracy to destroy their businesses through a broad range of anticompetitive behavior. The district court observed that Sterile and Stayfresh did not allege merely that illegal rates were set, but in addition that Sea-Land undertook further alleged anticompetitive acts by attempting to prevent a prospective distributor from entering into an agreement with Stayfresh. Because such activities would be beyond the scope of the ICC's jurisdiction, the antitrust action was not subject to dismissal on this ground.
 
 III
 
 8
 It has not always been clear whether antitrust litigation must be treated with special rules when ruling upon a motion for summary judgment. The Supreme Court has cautioned us "that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (Poller ) (footnote omitted). This language, however, cannot be interpreted either to mean that summary judgment motions should not be granted or that summary judgment motions even should be restrained in all antitrust cases as a class. The language merely teaches caution. Recognizing the limited nature of this cautionary instruction, we have stated that "if there is no genuine issue of material fact, and if the resisting party does not present a record sufficient to support a reasonable finding in his favor, a district court has a duty to grant the motion for summary judgment." Filco v. Amana Refrigeration, Inc., 709 F.2d 1257, 1260 (9th Cir.), cert. dismissed, --- U.S. ----, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983) (Filco ). See also Cascade Cabinet Co. v. Western Cabinet & Millwork Inc., 710 F.2d 1366, 1373-74 (9th Cir.1983); Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 672 (9th Cir.1980) (Blair Foods ); Harvey v. Fearless Farris Wholesale, Inc., 589 F.2d 451, 454 (9th Cir.1979) (Fearless Farris ); Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620, 624 (9th Cir.1977) (Mutual Fund ).
 
 
 9
 Thus, we have adopted the following rule applicable to summary judgment motions in antitrust cases:
 
 
 10
 Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper.
 
 
 11
 ALW, Inc. v. United Air Lines, Inc., 510 F.2d 52, 55 (9th Cir.1975) (ALW, Inc.) (footnote omitted). See also First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968) (Cities Service ); Mutual Fund, 553 F.2d at 624. Sterile and Stayfresh contend, however, that the ALW, Inc. standard improperly shifts the burden to a plaintiff whenever a defendant comes forward with understandable business-related explanations of its conduct. This argument not only rejects the clear holding of ALW, Inc., but is wholly inconsistent with the settled rule in this circuit. See, e.g., Fearless Farris, 589 F.2d at 454; Mutual Fund, 553 F.2d at 624. As we have previously held, a moving defendant may meet its burden by proffering "an entirely plausible and justifiable explanation of [its] conduct" that is "consistent with proper business practices." Blair Foods, 610 F.2d at 672; see Landmark Development Corp. v. Chambers Corp., 752 F.2d 369, 371-72 (9th Cir.1985) (Landmark ).
 
 
 12
 We see no reason to depart from our holdings which permit a defendant to meet its burden by showing legitimate business reasons for its conduct. Once a defendant adequately explains its conduct, it is not unreasonable to require a plaintiff to put forth significant probative evidence, that is, evidence which is capable of sustaining an inference "that tends to exclude the possibility that the [defendant was] acting independently," and thus lawfully. Monsanto Co. v. Spray-Rite Service Corp., --- U.S. ----, ----, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (Monsanto ) (emphasis added). See Landmark, 752 F.2d at 372. Otherwise, plaintiffs would be permitted to go forward with only speculation in hopes that a potential trial will unearth unknown evidence or force a settlement.
 
 
 13
 A party opposing summary judgment is entitled to the benefit of only reasonable inferences that may be drawn from the evidence put forth. E.g., Filco, 709 F.2d at 1261; Mutual Fund, 553 F.2d at 624. The district court must therefore undertake some initial scrutiny of the inferences that could be reasonably drawn from the evidence. A reasonable inference is one which "support[s] a viable legal theory," Mutual Fund, 553 F.2d at 624, which by necessary implication cannot be supported by "only threadbare conclusory statements instead of 'significant probative evidence.' " Id. at 625.
 
 
 14
 In determining whether an inference may be reasonable, the district court should not weigh competing inferences against each other. See id. at 624. When there is "substantial factual evidence" supporting both an inference of conspiracy and an inference of lawful conduct, "and the crucial question [involves] motive," summary judgment is inappropriate. Cities Service, 391 U.S. at 285, 88 S.Ct. at 1590, explaining Poller, 368 U.S. 464, 82 S.Ct. at 486. But when there is a failure to produce such substantial factual evidence to combat summary judgment and there is "overwhelming evidence" favoring the moving party, id. at 286, 88 S.Ct. at 1591; see also id. at 277, 88 S.Ct. at 1586, it may be unreasonable to draw an inference contrary to the movant's interpretation of the facts, id. at 285, 88 S.Ct. at 1590, and therefore a summary judgment would be appropriate even when motive is at issue. See id. at 279, 88 S.Ct. at 1587.
 
 
 15
 Thus, the object of this scrutiny is to determine whether there remains sufficient probative evidence which would permit a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy. See Poller, 368 U.S. at 472, 82 S.Ct. at 490; Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 894-95 (3d Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (evidence of motive must be weighed against business justifications put forth since court must draw line between reasonable inferences for jury's consideration and "impermissible speculation"). We now examine the district court's assessment of the challenge of Sterile and Stayfresh.
 
 IV
 
 16
 Sterile and Stayfresh initially lodge a procedural attack. They complain that the district court failed to find specifically that Sea-Land "demonstrated the absence of any material issue of fact," and that the "court overstated [their] burden in resisting Sea-Land's motion ... by requiring [them] to raise a 'substantial' issue of material fact."
 
 
 17
 The district judge clearly was aware of the proper standard, which he recited in his order. The argument of Sterile and Stayfresh is essentially founded on the district court's failure to state explicitly that Sea-Land met its initial burden. It is apparent, however, that the court implicitly found that Sea-Land had met its burden by producing evidence justifying its actions before the court placed the burden "upon plaintiffs to come forward with specific factual support for its allegations of a conspiracy." (Emphasis added). Their further contention that the court overstated their burden by requiring them "to raise a substantial issue of material fact" also lacks merit. Although the court did use the word "substantial" in one sentence, it appears to have been done only as a rephrasing of the Supreme Court's test requiring "significant probative evidence" to deny summary judgment used in Cities Service, 391 U.S. at 290, 88 S.Ct. at 1593, which the court cited and relied upon in defining the standard to be applied.
 
 
 18
 Turning to the merits, Sterile and Stayfresh assert that they have raised two issues of material fact from which complicity by Sea-Land in a Sherman Act section 1 conspiracy might be inferred. They first contend that whether Sea-Land raised its tariff after Sterile's indirect shippers used the grocery item category solely because it felt compelled to classify the goods under the higher rate of Item 850 remains in dispute.
 
 
 19
 In order for an antitrust plaintiff to succeed in a complaint based on section 1, he "should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " Monsanto, --- U.S. at ----, 104 S.Ct. at 1471, quoting Edward J. Sweeney & Sons, Inc. v. Texaco, 637 F.2d 105, 111 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). There must be sufficient evidence to support an inference of some unlawful agreement, Blair Foods, 610 F.2d at 672, indicating "that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds." American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). In this case, there is no question that a conspiracy existed among the dairies. The issue before us is whether there is any evidence from which a reasonable inference can be drawn indicating that Sea-Land joined that conspiracy.
 
 
 20
 As proof that a conspiracy existed between Sea-Land and the dairies, Sterile and Stayfresh point to certain deposition testimony and various letters exchanged between Nolan and Sea-Land concerning appropriate tariffs. Sea-Land asserts that it only raised its tariff for Sterile's goods after it realized the goods had been erroneously classified under its then-current tariff schedule. The relevant ICC regulations provide two distinct categories of tariffs. A specific commodity rate may be established to cover a specific, narrowly-defined product and is usually less expensive than a class rate which covers broad, general classes of commodities. See All States Freight, Inc. v. New York, New Haven & Hartford Railroad Co., 379 U.S. 343, 345, 85 S.Ct. 419, 420, 13 L.Ed.2d 324 (1964). Because a carrier is required to follow strictly its published tariffs, see 49 U.S.C. Sec. 11916 (formerly 49 U.S.C. Sec. 41(2)), a commodity rate may be applied only if the product shipped fits the description in the tariff schedule exactly. If there is no commodity rate, the applicable class rate then applies. See, e.g., Roach Appleton Manufacturing Co. v. United States, 265 F.Supp. 568, 570 (N.D.Ill.1967). If there is no applicable class rate, the nearest similar class rate applies under a "rule of analogy." This rule of analogy, however, does not apply to specific commodity descriptions. See 49 C.F.R. Secs. 1300.6(f), 1310.7(h) (1983). Moreover, a carrier is not permitted to charge discriminatory tariffs. See 49 U.S.C. Sec. 10741 (formerly 49 U.S.C. Sec. 316(d)).
 
 
 21
 Sterile initially began shipping its product at the class rate for "milk products, NOI (not otherwise indicated)." It later shipped its product indirectly through various freight consolidators, who described the goods as grocery items under Item 850, a specific commodity rate which encompassed "milk, canned, flaked or powdered," but not sterilized milk in paper cartons. This rate was less than one-half the class rate. When Sea-Land became aware of this, it required Sterile to pay the higher class rate and backcharged the freight consolidators for the difference between the improper and the proper tariffs.
 
 
 22
 Sterile then requested a lower rate, simultaneously complaining to the ICC. Sea-Land followed this by requesting and receiving ICC approval of a new Item 1345 tariff covering milk products "aseptically packaged, in foil-lined paper cartons." Subsequent to this action, Nolan wrote Sea-Land complaining that Item 1345 gave an unfair rate advantage to Sterile's product over his employer's bulk milk shipments without any justification based on Sea-Land's costs of shipping. Nolan sent copies of this letter to both the ICC and his congressman. As a result of Nolan's complaint, Sea-Land reviewed its tariffs and thereafter expanded Item 1345's coverage to include bulk milk shipments. Although Nolan remained unsatisfied, Sea-Land failed to effect any further changes in its tariff schedule favoring Nolan's employer. The last action taken by Sea-Land was a further modification of the tariff classification for Sterile's product favoring Sterile.
 
 
 23
 The principal contention of Sterile and Stayfresh is that Sea-Land's refusal to apply the lower commodity rate, following its recognition that Sterile was improperly using a specific commodity rate, and its action seeking backcharges, were motivated solely by Nolan's pressuring Sea-Land to join the dairies' conspiracy. Sea-Land counters that it was required to follow its tariff schedules until any later formal amendment, subject to possible criminal sanctions for any violations. See 49 U.S.C. Sec. 11903 (formerly 49 U.S.C. Sec. 41). Moreover, Sea-Land asserts that its reviews of its tariff schedules in response to customer complaints--reviews that were conducted at the request of both Sterile and Nolan--reflected normal, routine business behavior.
 
 
 24
 At oral argument, Sterile and Stayfresh conceded that their products did not literally fall within Item 850's specific commodity classification. They further conceded that Sea-Land was under no obligation to amend its tariff schedules prior to a request by Sterile, and that Sea-Land may have been in violation of its tariff schedules if it permitted shipment under the Item 850 rate. Nevertheless, they contend that Nolan's complaints of unfair treatment, while not unlawful on their face, together with Sea-Land's actions thereafter, indicate as a whole that Sea-Land joined the dairies' conspiracy. We find no merit in this contention.
 
 
 25
 In the similar case of Cities Service, the plaintiff sought a business relationship regarding Iranian oil with defendant Cities Service, which Cities Service subsequently declined. At the time, plaintiff had a favorable contract with respect to Iranian oil that it could not take advantage of because of an acknowledged world-wide cartel boycotting Iranian oil products. Plaintiff alleged that Cities Service's rejection of its offer indicated that Cities Service had been coerced into joining the cartel by the other members. The sole evidence of Cities Service's membership in the cartel put forth by plaintiff was the fact that Cities Service had rejected plaintiffs' offer. The Supreme Court affirmed a summary judgment in favor of Cities Service following defendant's showing of legitimate business reasons for the rejection. In so holding, the Court emphasized that Cities Service was at most a "tangential defendant" as compared to the acknowledged members of the cartel who were the principal cause of plaintiff's alleged injury. See Cities Service, 391 U.S. at 293, 88 S.Ct. at 1594.
 
 
 26
 In the case before us, the principal source of injury to Sterile and Stayfresh lies in the conspiracy among its dairy competitors. Here, too, Sea-Land is a tangential defendant whom Sterile and Stayfresh contend coercively acquiesced (following Nolan's "pressure") in furthering the dairies' conspiracy by manipulating its tariffs for Sterile's product. Sterile and Stayfresh have conceded that there is no evidence that Sea-Land was even aware of the dairies' conspiracy other than by its receipt of several allegedly "threatening" complaints by Nolan to stop treating his employer "unfairly."
 
 
 27
 The Supreme Court has recently held in an analogous situation alleging a conspiracy to fix prices that a company's unilateral response to customer complaints alone is insufficient evidence from which to infer an unlawful agreement. Monsanto, --- U.S. at ----, 104 S.Ct. at 1470. This holding is dispositive. As the Court emphasized, "[p]ermitting an agreement to be inferred merely from the existence of complaints"--or responses to them--"could deter or penalize perfectly legitimate conduct." Id. The "pressure" applied by Nolan was merely a threat to complain to the ICC of unfair treatment (i.e., discrimination in tariffs unjustified by actual costs of shipping), a typical complaint by an old customer facing new competition. We have previously emphasized that coercive "[d]emands or threats, however, must be distinguished from mere 'exposition, persuasion, argument, or pressure.' " Filco, 709 F.2d at 1263, quoting Yentsch v. Texaco, Inc., 630 F.2d 46, 53 (2d Cir.1980). The fact that these "threats" were communicated directly to the ICC and a congressman by Nolan himself casts a cold shadow on the assertion that these complaints were an attempt to induce Sea-Land to join an unlawful conspiracy.
 
 
 28
 Moreover, it is indisputable that Sea-Land acted favorably toward Sterile after Sterile requested an amended tariff, and that Sea-Land refused to acknowledge further complaints by Nolan following its modification of Item 1345's coverage at Nolan's request. Such actions by Sea-Land, if anything, indicate the absence of any complicity on its part in the overall conspiracy. Indeed, dairy officials, while admitting their own participation in a conspiracy in deposition testimony, repeatedly denied any involvement by Sea-Land.
 
 
 29
 The second contention presented to us is that a meeting took place between a Sea-Land official and a prospective Stayfresh distributor, at which it is alleged that the potential distributor was pressured by Sea-Land into ending its negotiations with Stayfresh. But as the district court observed, regardless of whether such meeting took place, Sterile and Stayfresh have failed to present any evidence of the substance of any conversation that may have taken place, or that it had any influence on the individual's decision to terminate negotiations over a distributorship. Moreover, there is overwhelming evidence that the potential distributor's decision was based solely on the product's uncertain potential for success. Not only did his own examination of Stayfresh's inventory indicate substantial quantities of out-dated product, but while he was visiting Stayfresh's warehouse, he witnessed one of its vehicles being seized by creditors.
 
 
 30
 We recognize that direct evidence of a conspiracy may often be difficult to obtain. Courts have thus permitted anti-trust plaintiffs to proceed to trial in many cases with only circumstantial evidence of conspiracy. E.g., Poller, 368 U.S. at 472-73, 82 S.Ct. at 490-91. But such is not the case here. This is especially true when the dairies have admitted their participation in a conspiracy, while simultaneously exonerating Sea-Land with nothing to gain for their exculpatory statements.
 
 
 31
 Whether the standard is stated as "significant" or "substantial" probative evidence, Sterile and Stayfresh have not met their burden. We agree that " '[s]ubstantial evidence is more than a mere scintilla.' " Westinghouse Electric Corp. v. CX Processing Laboratories, 523 F.2d 668, 673 (9th Cir.1975), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); accord British Airways Board v. Boeing Co., 585 F.2d 946, 952 (9th Cir.1978) ("A mere scintilla of evidence will not do...."), cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Following over six years of discovery, nine years of litigation, and scores of depositions, Sterile and Stayfresh have come up empty-handed with respect to Sea-Land. Thus, the district court appropriately put an end to this litigation.
 
 
 32
 AFFIRMED.