DAHL, INC., Plaintiff-Appellant,

v.

ROY COOPER CO., Inc., et al.,
Defendants-Appellees.

No. 23840.

United States Court of Appeals,
Ninth Circuit.

Sept. 3, 1971.

Maxwell Keith, (argued), San Francisco, Cal., for plaintiff-appellant.

Allan Albala, (argued), of Swerdlow, Glikbarg & Shimer, Beverly Hills, Cal., Michael N. Khourie, (argued), Bruce Jacobs, of Broad, Busterud & Khourie, Noble K. Gregory (argued), of Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.

Before JERTBERG, MERRILL and BROWNING, Circuit Judges.

MERRILL, Circuit Judge:

In this antitrust action, brought pursuant to § 4 of the Clayton Act, appellant Dahl, Incorporated, seeks treble damages for injuries allegedly resulting from violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 1 et seq. Dahl is the owner of the Paris Theatre in Palo Alto, California. Appellees include three exhibitors of motion pictures in the Palo Alto-Menlo Park area and ten motion-picture distributors. They are charged with conspiracy to restrain and monopolize trade in the distribution and exhibition of motion pictures in interstate commerce in the Palo Alto-Menlo Park area. The exhibitors are further charged with monopolizing and attempting to monopolize the exhibition of motion pictures in that area.

The Paris Theatre opened in July, 1961, under the management of Harold Snyder, president of Dahl, Inc. It was constructed by remodeling two vacant store buildings and had a capacity of 278 seats—the smallest in the Palo Alto-Menlo Park area. It was designed to operate as an "intimate 'art' theatre," or "coffee-shop theatre," and its announced intention was to confine its exhibition to "art film"—described by one of its witnesses as that which appeals to "a limited segment of the population * * * the so-called intelligentsia." It was not interested in commercial films, nor in attracting children or teenagers. It announced its interest in art films to film distributors and in 1962 demanded the right to engage in competitive bidding against two art houses in the area owned by appellee Cooper. Later that year Dahl and Cooper agreed to allocate art pictures between the Paris and the two Cooper theatres, thus avoiding the necessity for competitive bidding. This arrangement terminated in May, 1964. At that time, in the view of Dahl's film buyer, John Bowles, there was a shortage of supply of art films and the art business was not going well. Dahl then, for the first time, sought to obtain commercial film for first-run exhibition. Two months later, in July, 1964, this action was brought.

After completion of discovery and crystallization of contentions in pretrial memoranda, Dahl's claim in substance was reduced to two contentions: first, that defendant Roy Cooper Company had itself attempted to monopolize the first-run quality picture exhibition market in violation of § 2; and, second, that appel-

lees had conspired to exclude the Paris Theatre from the first-run picture market in violation of §§ 1 and 2. On motion of defendants-appellees, summary judgment in their favor was entered; the District Court concluded that no genuine issue of material fact remained for trial. From that judgment this appeal was taken. We affirm.

■ Dahl's attempt-to-monopolize claim rests entirely on its allegation that an employee of Cooper told an employee of Dahl that Cooper would drive Dahl out of business if Dahl chose to compete. Such a manifestation of intent to triumph in the competitive market, in the absence of evidence of unfair, anticompetitive or predatory conduct, is not enough to establish a violation of § 2. *See* Hiland Dairy, Inc. v. Kroger Company, 274 F.Supp. 966 (E.D.Mo.1967), aff'd 402 F.2d 968 (8th Cir. 1968).

■■ Plaintiff can establish a violation of § 1 or § 2 if he can show an agreement between two or more distributors or distributors and exhibitors, *see, e. g.,* Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L. Ed.2d 741 (1959); Bigelow et al. v. RKO Pictures, Inc., 327 U.S. 251, 66 S. Ct. 574, 90 L.Ed.2d 652 (1946), or between two or more exhibitors, United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), to exclude plaintiff from the market. However, a mere refusal to deal by an individual distributor not acting in agreement with anyone else is not by itself a violation of the antitrust laws. *See* Klor's, Inc. v. Broadway-Hale Stores, *supra,* 359 U.S. at 212, 79 S.Ct. 705; Lawlor v. National Screen Service Corp., 270 F.2d 146 (3d Cir. 1959), cert. denied, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960). A fortiori, plaintiff has no antitrust claim where its failure to obtain desired films is attributable to its own mistakes or failure to request them. *See* Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 268 F.2d 246 (2d Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959).

■ Thus, conspiracy is the gravamen of this complaint. Dahl need not show explicit contractual agreements in order to prove a conspiracy, but it must demonstrate more than that the alleged co-conspirators engaged in a course of conduct, even if conscious of each other's parallel behavior, in which they would have engaged regardless of the others' conduct. *See e. g.,* Theatre Enterprises, Inc. v. Paramount Film Distr. Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L. Ed. 273 (1954).

Our study of the record convinces us that it is wholly lacking in any evidence of conspiracy to restrain or monopolize commerce and in any facts from which an inference of conspiracy can rationally be drawn, and that summary judgment was proper. *See* First National Bank of Ariz. v. Cities Service, 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Chapman v. Rudd Paint and Varnish Co., 409 F.2d 635, 643 (9th Cir. 1969).

■ The only rational inference to be drawn from the record is that, as a newcomer with limited seating capacity, the Paris simply could not compete effectively and its survival depended upon its ability to avoid competition by such means as its arrangement with Cooper respecting art film. After changing its policy to include commercial film, Dahl was able to bid competitively for first-run showings and did obtain some few films. We cannot escape the conviction that Dahl really is complaining that it was not apportioned film by the distributors free from the necessity of competing for it.

Dahl has provided an impressive list of films it unsuccessfully attempted to obtain from the distributors, and it attributes its lack of success to a conspiracy or improper refusal to deal. However, an examination of the record discloses that in every instance an explanation existed wholly consistent with prop-

er business operations, and Dahl has failed to advance any further evidence which would allow any inference of conspiracy or antitrust violation.[1]

Dahl emphasizes certain additional aspects of the case which it argues demonstrate impropriety. In none of them do we find merit.

■ 1. For some years prior to 1961 and continuing through 1964, commercial film exhibitors in the area operated under a "split-of-product" agreement (similar to the arrangement between Dahl and Cooper) by which they divided the available film between themselves so as to eliminate competition between themselves as to those films. The agreement, however, related to commercial film in which Dahl had shown no interest until May, 1964. Further, there is no evidence that the agreement, although anticompetitive in character and as such subject to complaint by the distributors, *see* Twentieth Century Fox Films Corp v. Goldwyn, 328 F.2d 190 (9th Cir.), cert. denied, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964), served to exclude Dahl from the market or give it any antitrust claim. *See* Viking Theatre Corp. v. Paramount Film Distr. Corp., 320 F.2d 285, 292–293 (3d Cir. 1963), aff'd. per curiam, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964); Seago v. North Carolina Theatres Inc., 42 F.R.D. 627, 638 (E.D.Cal.1966), aff'd. per curiam, 388 F.2d 987 (4th Cir. 1967). Dahl could still bid for the films, even though members of the split were committed not to do so. The split did no more than reduce the competition against which Dahl would be bidding.

■ 2. Dahl complains that conduct of certain of the appellees constituted noncompliance with a consent decree in another case, entered into by appellees with the Department of Justice, respecting the manner in which film would be offered to exhibitors. We need not reach the merits of this contention. Only the Government can seek enforcement of its consent decrees. United States v. American Society of Composers, Authors, and Publishers, 341 F.2d 1003 (2d Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965); *see also*, United States Gypsum Co. v. National Gypsum Co., 387 F.2d 799 (7th Cir. 1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292 (1968).

■ 3. Dahl complains of the fact that on occasions where films sought by it had been awarded to a different exhibitor on better terms for the distributor than those offered by Dahl, the distributor had later readjusted the terms in favor of the exhibitor. It appears that such readjustment is commonplace in the industry where the film has had a disappointing run and a low gross profit has resulted and that this was the reason for the readjustments to which Dahl refers. There is no showing whatsoever that Dahl was arbitrarily excluded from such readjustments or that they were predatorily motivated. *See* Viking Theatre Corp. v. Paramount Film Distr. Corp., *supra*, 320 F.2d at 296.

Judgment affirmed.

---

1. The record shows no more than that Dahl's inability to secure specific films was in each instance for one of the following reasons:

   1. Dahl failed to bid for or request the film;

   2. Dahl sought the film after it had been sold to a competitor;

   3. Dahl was told by the distributor that it already had a customer;

   4. Dahl's bid was inferior to that of a competitor;

   5. Dahl's bid (and any others which were entered) was inadequate, and the distributor chose to sell the film by some method other than bidding;

   6. Dahl sent a bid to the wrong distributor.

   Only No. 3 even hints at the possibility of impropriety, and even in those cases there is nothing to suggest that the advice given was untrue or that, if a choosing between customers was involved, the choice was pursuant to conspiracy rather than for valid business reasons relating to potential profits or credit experience.