**THE MOVIE 1 & 2, Plaintiff,**

**v.**

**UNITED ARTISTS COMMUNICATIONS, INC., et al., Defendants.**

**No. C 86–20390 RPA.**

United States District Court, N.D. California.

Dec. 22, 1987.

Mark F. Anderson, Law Offices of Mark F. Anderson, Cannatta Genovese & Papale, Lawrence G. Papale, Steven J. Cannata, H. Joseph Escher, III, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Charles B. Cohler, Kevin C. McCann, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for Nickelodeon Corp.

Shartsis, Friese & Ginsburg, Stewart H. Foreman, John S. Yun, San Francisco, Cal., for European Classics.

Robert J. Rose, Joel E. Boxer, Nutter, Bird, Marella, Boxer, Wolpert & Matz, P.C., Los Angeles, Cal., for Paramount Pictures, Orion Pictures, Orion Classics, Warner Bros., Twentieth Century Fox Film Corp., Universal Film, Buena Vista, Tri–Star Pictures, Columbia Pictures and MGM/UA Distribution (Group I Distributors).

Shartsis, Friese & Ginsburg, Stewart H. Foreman, Tracy L. Salisbury, San Francisco, Cal., for defendants Cannon Releasing Corp., Island Pictures, Inc., New World Pictures, Ltd., Skouras Pictures, European Classics, R/M Stafford Organization dba Cardinal Films, and The Samuel Goldwyn Co.

Khourie, Crew, & Jaeger, San Francisco, Cal., for defendant United Artists Communications, Inc.

## ORDER GRANTING SUMMARY JUDGMENT AND DISMISSING STATE CLAIMS

AGUILAR, District Judge.

### I. INTRODUCTION

Plaintiff, a Santa Cruz movie theatre, sued two competing motion picture exhibitors and nineteen film distributors alleging antitrust violations of the Sherman Act and pendent state claims. The defendants' simultaneously brought four separate summary judgment motions which came on for hearing December 11, 1987. The Court has received, read, and considered all papers submitted on the motions, and in addition, heard the argument of counsel. Good

cause appearing therefor, the Court GRANTS the summary judgment motions on the first, second, and third claims for relief. Additionally, the Court dismisses jurisdiction over the fourth and fifth state law claims for the reasons set out below.

## I. FACTUAL BACKGROUND

In February of 1984, Harold Snyder and his two sons, David and Larry Snyder opened The Movie 1 & 2, [The Movie] a two screen motion picture theatre with 225 seats in each auditorium, with the intent of exhibiting what are termed "commercial" and "art" pictures on a first run basis. The theater is located in downtown Santa Cruz, California, in a converted storefront it shares with a moped shop. It appears to be a nice, clean, medium sized theatre.

Santa Cruz has 9 theatres with 23 individual screens and two drive-in screens in addition to The Movie. Defendant United Artist Communications [UA] operates 5 theaters with a total of 11 screens which show first run movies.

Defendant Nickelodeon Inc. operates two theatres, one, the Nickelodeon, with 4 screens, plays mostly first run films, the other, the Sashmill, plays vintage movies. The owners of the Nickelodeon, William and Nancy Raney, have emphasized exhibition of "motion pictures with a more serious theme, motion pictures which [they] believe[ ] educate as well as entertain." The Nickelodeon is colloquially known as an art house for its choice of movies.

Scott's Valley theatre, a non-defendant in this suit, has 4 screens which play both first run and sub-run pictures. The drive-in theatre has 2 screens, although plaintiffs assert that by its nature, the drive-in does not compete with the "hard top" theatres.

The other defendants in this case are 10 major motion picture distributors classified as the Group I distributors, and the denom-inated Group II distributors of 9 independent distribution companies.[1]

Distributors have sweeping discretion in licensing their movies. *Universal Amusements v. General Cinema*, 635 F.Supp. 1505, 1515–1517 (S.D.Tex.1985). They take into consideration a myriad of factors, such as the percentage terms and guarantees offered, theatre quality, seating capacity, location and performance records. The distributors assert that the single most important factor in deciding how to license a picture is the perceived "grossing potential" of the theatres. Grossing potential is based upon a perception of the theatre's past grossing history on comparable motion pictures. They note that because new theatres have no grossing history, it is common practice for the new entrant to offer substantial guarantees in order to win pictures and develop a history.

Plaintiff brought this antitrust suit for damages and injunctive relief pursuant to § 4 of the Clayton Act (15 U.S.C. § 15) for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1,2), and state law claims of unfair competition and interference with prospective advantage.

Plaintiffs allege that the two exhibitor defendants entered into an illegal split whereby UA monopolized the first run commercial film exhibition market and the Nickelodeon monopolized the first run art film exhibition by conspiring to allocate the commercial and art films to their respective theatres. Plaintiffs further allege that the distributors participated in this illegal allocation scheme to discriminate against The Movie in furtherance of the monopolies.

The pattern of film exhibition in Santa Cruz is indeed characterized by the Nickelodeon showing mostly "art" films and the UA predominantly commercial films. The significance of this pattern forms the basis of both plaintiff's suit and defendants' summary judgment motions.

---

**1.** Group I consists of Paramount Pictures Corporation; Warner Bros. Distributing Corporation; Columbia Pictures Industries, Inc; TriStar Pictures, Inc.; Twentieth Century Fox film Corporation; Universal Film Exchanges, Inc.; MGM/UA Distribution Company; Orion Pictures Distribution Corporation; Orion Classics; and Buena Vista Distribution Co. Group II consists of Cannon Releasing Corp.; New World Pictures, Ltd.; European Classics; Skouras Pictures; Kino International Corp.; Island Pictures, Inc.; Cinecom International Films; Cardinal Films; and Samuel Goldwyn Company.

## II. DISCUSSION

The Court has before it summary judgment motions from the Nickelodeon, UA, Cinecom, and jointly, 17 of the Group I and II distributors.[2]

■ The Court will review each of the plaintiff's claims in light of the summary judgment attack to determine whether plaintiff has come forward "with specific facts showing that there is a genuine issue of material fact" to support the allegations of the complaint as to the various defendants. Rule 56(c); *Matsushita Electrical Industrial Co. v. Zenith Radio, et al.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986); *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no issue for trial unless there is sufficient evidence favoring the plaintiff for a jury to return a verdict for them. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2516, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id., cites omitted.* Although in antitrust litigation, summary judgment is disfavored if extensive factual determinations must be made concerning intent and motive, *Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1207 (9th Cir.1982), it is nevertheless "appropriate in the absence of any significant probative evidence tending to support the complaint." *Thee Movies of Tarzana v. Pacific Theatres*, 828 F.2d 1395 (9th Cir.1987).

### A. Group Boycott in Violation of 15 U.S.C. § 1.

The Movie alleges a 15 U.S.C. § 1 conspiracy in the unreasonable restraint of trade whereby the defendant exhibitors coerced and induced the defendant distributors to refuse to grant plaintiff licenses for first run commercial and art motion pictures. In effect, defendants as a group allegedly boycotted plaintiff with the purpose of eliminating it as a competitor and price cutter. The distributors allegedly refused to deal with plaintiff and exacted excessive terms for the movies it was allowed to license.

■ The allegations constitute non-price restraints of trade which are evaluated under the rule of reason. To establish a cause of action for an unreasonable restraint of trade under the rule of reason, the plaintiff must show (1) an agreement or conspiracy among two or more persons; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes antitrust injury. *Theee Movies of Tarzana v. Pacific Theatres*, 828 F.2d 1395 (9th Cir.1987).

■ Plaintiff fails to prove the first element of the § 1 restraint of trade allegation—that defendants acted as part of a conspiracy or pursuant to an agreement and not independently. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Under § 1, "independent action is not proscribed." The distributors have "a right to deal, or refuse to deal, with whomever [they] like as long as they do so independently." *Id.* To establish a violation of § 1, plaintiff must "show an agreement between two or more distributors or distributors and exhibitors to exclude plaintiff from the market." *Dahl Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir.1971). In addition, plaintiff must show the agreement with evidence that the inference of conspiracy is reasonable in light of the competing inferences of independent action. *Matshushita*, 106 S.Ct. at 1357.

The underpinnings of plaintiff's evidence is the inference of a split the Court is expected to draw from the alleged historical pattern of movie exhibition in Santa Cruz. In addition, plaintiff argues that the defendant distributors' acquiescence in the defendant exhibitors' illegal scheme to split and monopolize the art and commercial market supplies the element of agreement and proves the conspiracy. *United States v. Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) Accordingly, each film contract, between UA and a distributor and the Nickelodeon and a distributor, represents a meeting of minds to accomplish an unreasonable restraint of trade

---

**2.** Kino Corporations is not a party to any of the case proceedings.

and therefore establishes a conspiracy for purposes of § 1 of the Act.

However, plaintiff fails to substantiate the allegations of a split or distributor acquiescence in refusing to license to The Movies with admissible evidence.

### 1. The Evidence of a Split Agreement

The plaintiff relies on the historical pattern of the Nickelodeon and UA's film exhibition to prove its allegations of a split agreement. Larry Snyder provides a definition of art and commercial films and then proceeds to denominate films which played at the UA and Nickelodeon screens as art or commercial. While the deposition testimony generally recognized that the Nickelodeon is known as an "art house" and the UA cinemas as commercial theatres, the mere fact that these exhibitors have played films consistent with their marketing strategy and philosophy does not constitute an unfair restraint of trade conspiracy. In addition, plaintiff's booking agent, Carl Smiley, stated that he did not see a pattern which would lead him to believe that a split operated in Santa Cruz, and it was no longer reasonable to differentiate between "art" film and other product. Larry Snyder said in his deposition that the definition of an art film depended on each person and a film was art or commercial depending on where it played.

The alleged split is consistent with permissible and legal business activities. The Nickelodeon opened with the intent of showing specialized films and continues to do so, it competes for general theatre goers with UA and the other theatres in this manner. The permissible inferences to be drawn from plaintiff's ambiguous evidence of a pattern are limited under the antitrust laws. *Monsanto* held "that conduct as consistent with permissible competition as with illegal conspiracy does not standing alone, support an inference of antitrust conspiracy." 465 U.S. at 764, 104 S.Ct. at 1471. The *Matsushita* Court noted that plaintiff had to present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." 106 S.Ct. at 1357.

The only evidence submitted is inadmissible and contradicted hearsay from a third person, Mr. Al Charpiotti. The Court cannot consider this evidence under Rule 56(e).

▮ Plaintiff does refer to an alleged split agreement that existed between UA and a previous competitor Kindair corporation in the 1970's. UA eventually bought out Kindair corporation before The Movie opened. Plaintiff has no standing to complain of this previous split which occurred before its entry onto the market and did not produce any antitrust injury to The Movie. *See Orion Pictures v. Syufy Enterprises*, 829 F.2d 946 (9th Cir.1987); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (1971).

### 2. Distributor acquiescence in the alleged split

Plaintiff next argues that the exhibitors coerced or induced the distributors into joining the split. The complaint alleges that "UA informed distributors that it would refrain from dealing with distributors that did not honor the split arrangement." Plaintiff intends to prove this charge with reference to the alleged split. Once again, the ambiguous pattern does not by itself prove a conspiracy or any illegal activity. Plaintiff admits that it "knows of no conversations in which UA threatened to refrain from dealing with any distributor who did not honor the split."

Plaintiff also claims that the distributors engaged in anticompetitive conduct with the exhibitor defendants which deprived plaintiff of first run film exhibitions. The allegedly anticompetitive conduct consisted of bid tipping, moveovers, adjustments to film rental, and sham bidding. Plaintiff claims in addition that the distributors rejected its superior bids when licensing to the UA and Nickelodeon.

#### a. Bid Tipping

Plaintiff relies on a deposition statement from Mr. Bill Raney that while involved in oral negotiations, not bidding, he had on a few occasions received information about competing offers. The Snyder's had like-

wise received information from a distributor of Mr. Raney's offers on a film. Distributors on occasion, it appears, provide information concerning offers they have already received in order to receive a higher offer from another exhibitor. These disclosures occurred in negotiations, not written bidding and appear to have favored plaintiff and competition. In addition, Mr. Raney declared that he had not received bid tipping from any of the individual defendant distributors. Without any further evidence of bid tipping on particular movies or which defendant distributors may have engaged in bid tipping, the Court cannot find this conduct as evidence of a conspiracy among the various defendants to restrain trade.

### b. Moveovers

The Movie complains of moveovers, the change of auditoriums, within or outside of the same complex without any time elapsing between runs while under the licensing agreement for the first screen.

Plaintiff cites *United States v. Paramount Pictures,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) to suggest that moveovers are *per se* prohibited by the courts, yet he fails to account for the particular context of that ruling. The Court therein was condemning the nationwide monopolization of theatre exhibition and distribution. Distributors in that case were entering formula deals with a circuit of theatres that covered broad geographic areas. The circuit was allowed to allocate playing time and film rentals among the various theatres as it saw fit, effectively eliminating the opportunity for other theatre owners to bid for the feature in their respective areas at all. In the present case, any possible moveovers would have occurred only after the competitive bidding.

In any event, plaintiff once again fails to offer admissible and sufficient evidence that the distributors and exhibitors entered into an unlawful agreement to allow moveovers in a discriminatory fashion. The absence of firm evidence undermines plaintiff's allegations of moveovers being used to further an anti-competitive conspiracy.

### c. Film Rental Adjustments

Plaintiff objects to the instances where distributors adjusted the terms of the defendant exhibitors film rental licenses if the film performed poorly at the box office. As the Court emphasized in *Dahl v. Roy Cooper,* "readjustment is commonplace in the industry where the film has had a disappointing run and a low gross profit." 448 F.2d at 20.

### d. Rejection of Bids

As an alternative method of proving distributor involvement in a split, plaintiff alleges that there was a systematic pattern of rejecting its superior offers made to the distributor defendants. Since a distributor may refuse to deal with anyone as long as it is not acting under an agreement or conspiracy, plaintiffs would have to show a consistent pattern of distributors refusing substantially superior bids to prove that an agreement existed in the absence of direct evidence of such an agreement.

However, defendants represented at hearing that deposition testimony of plaintiff's expert shows that there is no evidence of superior bids. Plaintiff did not contradict this declaration.

In addition, the distributors complain of receiving inferior bids from plaintiffs. For example, guarantees are especially important to convince distributors to license to new theatre houses which do not have grossing histories. Each company felt that the guarantees offered by the plaintiff were insubstantial, when they were made at all. The plaintiff's own booking agents responded in their depositions that they believed the guarantees to be insubstantial. Carl Smiley stated that Mr. Snyder would not follow his recommendations on guarantees, and did not bid as much as Smiley wanted him to, if he bid a guarantee at all. Howard Taormino, stated that he felt the guarantees were insufficient. In only 43 instances out of a total of 182 first-run pictures on which the plaintiff expressed an interest during the damage period was any guarantee offered at all.

In addition, the evidence shows that The Movie did not even bid on all of the films it

claims it could have acquired the licenses for during the damage period.

This case is much like plaintiff's similar and unsuccessful 1971 antitrust suit, *Dahl v. Roy Cooper,* wherein the circuit stated "we cannot escape the conviction that Dahl really is complaining that it was not apportioned film by the distributors free from the necessity of competing for it." 448 F.2d at 19.

In summary, plaintiffs have failed to provide the court with evidence of an agreement between any two or more of the defendants in support of its first claim for relief. The circumstantial evidence of a split, allegedly discriminatory business practices and a group boycott of The Movies does not go beyond general allegations.

Accordingly, since plaintiff has failed to set out evidence which raises a material issue of fact as to the conspiracy element of the § 1 claim, the Court HEREBY GRANTS all four summary judgment motions.

B.  *Monopolization Under 15 U.S.C. § 2*

The Movie alleges UA attempted to monopolize, and monopolized the first run commercial film market, and the Nickelodeon attempted to monopolize, and monopolized the first run art film market in violation of 15 U.S.C. § 2. To support this claim, plaintiff realleges the same practices as in the § 1 claim and adds: defendants induced and obtained unreasonably lengthy play time rights; induced distributors not to place motion picture licenses up for bid and induced distributors not to open many first run pictures in Santa Cruz until weeks after the pictures break or national opening.

■ To establish monopolization under § 2 of the Sherman Act, The Movie must prove:

1) possession of monopoly power in the relevant market;

2) willful acquisition or maintenance of that power; and

3) causal 'antitrust' injury." *Syufy Enterprises v. American Multicinema,*

*Inc.* 793 F.2d 990, 993 (9th Cir.1986) citing *Transamerica Computer Co., Inc v. International Business Machines Corp.,* 698 F.2d 1377, 1382 (9th Cir.) *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

■ The elements of the attempt to monopolize claim are:

1) specific intent to control prices or destroy competition;

2) predatory or anticompetitive conduct to accomplish the monopolization; and

3) dangerous probability of success; and

4) causal 'antitrust' injury. *Transamerica Computer* 698 F.2d at 1382.

*Transamerica* focused on the relationship between the second elements of the attempt and monopolization offenses. "Conduct that does not constitute 'willful acquisition or maintenance' of monopoly power cannot constitute the 'predatory or anticompetitive conduct' required to establish the offense of attempt to monopolize." *Id.*

■ The Court finds that the Movie failed to set forth facts to establish that UA's and the Nickelodeon's conduct was not lawful. Therefore, since plaintiff fails to establish the second element of either facet of the second claim for relief, summary judgment is HEREBY GRANTED as to that claim.

The Court does not now discuss whether plaintiff established that defendants exercised a monopoly over the relevant sub markets as discussed in *Syufy,* op. cit. It is sufficient for the purposes of this motion to find that defendants' conduct was lawful.

Plaintiff failed to adduce evidence of its allegations of a split; the coercion of distributors not to license films to The Movies; the UA's abuse of its massive buying power by leveraging its power in one town to obtain a license in Santa Cruz; or the delay of showing films in Santa Cruz until some time after they had premiered nationally, and the bid tipping. Most of these elements were discussed above. The allegations of holding back films was disproved

by evidence that films opened in Santa Cruz at the same time as they did in San Francisco. As to the allegations of UA's abuse of its buying power, Larry Snyder said that his evidence of UA's coercion came from what he read in trade magazines about UA's buying power and the fact that UA was always being sued. This is insufficient.

Finally, as discussed above, plaintiff has submitted no evidence that UA or the Nickelodeon coerced the distributors into denying film licenses to The Movies. The distributors apparently denied the licenses based on poor bids or perceived poor grossing potential of this new theatre.

The Movie also complains of advance advertising, moveovers, and adjustments. Adjustments clearly fall into the category of "ordinary business practices typical of those used in a competitive market" which do not constitute anticompetitive conduct. *Conoco, Inc. v. Inman Oil Co., Inc.* 774 F.2d 895, 905 (8th Cir.1985); As discussed above, *Dahl v. Roy Cooper* recognized these adjustments as commonplace in the movie industry. Other districts have recognized moveovers as common practice as well. *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 886 n. 7 (8th Cir.1978) (There is nothing inherently illegal or improper about moveovers); *Ayers v. Pastime Amusement Co.*, 283 F.Supp. 773, 789 (D.S.C.1968) The question is whether the moveovers were actually used in a discriminatory fashion. As discussed above, plaintiff fails to point the Court to particular moveovers granted in a discriminatory fashion with resultant injury to plaintiff.

Finally, plaintiff complains that UA and the Nickelodeon advertised films before they received the license to show the movie. This advertising, they argue, evidences defendants confidence that they would receive the film. The question for the Court however, is whether the advertising was illegal or predatory. Plaintiff does not address this issue. While it may be questionable practice to advertise films for which you do not have the license, this alone does not constitute monopolization.

Because plaintiff has failed to support its allegations of unlawful conduct with evidence which could withstand the motion for summary judgment, the Court HEREBY GRANTS the motions for summary judgment as to the second claim for relief.

### C. *Combination and Conspiracy to Monopolize* 15 U.S.C. § 2

Plaintiff's § 2 conspiracy to monopolize claim mirrors the § 1 conspiracy claim. Plaintiff relies on the alleged pattern of movie exhibition in Santa Cruz, which, as discussed above, does not by itself prove a conspiracy. Summary judgment is HEREBY GRANTED as to the third claim for relief, conspiracy to monopolize in violation of 15 U.S.C. § 2.

### D. *Pendent State Law Claims*

The Court hereby exercises its discretion to relinquish its jurisdiction of the pendent state claims of unlawful business practice and interference with prospective economic advantage. The fourth and fifth claims for relief are HEREBY DISMISSED from this Court's jurisdiction.

## IV. CONCLUSION

The Court HEREBY GRANTS the four motions for summary judgment as to the first, second and third claims for relief. In addition, the Court DISMISSES the pendent state law claims. Judgment shall be entered for defendants.

IT IS SO ORDERED.