909 F.2d 1245
 58 USLW 2733, 1990-1 Trade Cases 69,029,
30 Fed. R. Evid. Serv. 505
 The MOVIE 1 & 2, a general partnership, Plaintiff-Appellant,
v.
UNITED ARTISTS COMMUNICATIONS, INC.; Paramount Pictures
Corporation; Columbia Pictures Industries, Inc.; Tri-Star
Pictures, Inc.; Twentieth Century Fox Film Corporation;
Universal Film Exchanges, Inc.; MGM/UA Distribution
Company; Orion Pictures Distribution Corporation; Orion
Classics, a division of Orion Pictures Corporation; and
Buena Vista Distribution Co., Inc., Defendants-Appellees.
 No. 88-1734.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 16, 1989.
Decided May 14, 1990.
Amended July 25, 1990.
 
 1
 Ashley M. Winn, Santa Cruz, Cal., for plaintiff-appellant.
 
 
 2
 Robert J. Rose, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, Cal., for Group I Distributors.
 
 
 3
 Stewart H. Foreman, Shartsis, Friese & Ginsburg, San Francisco, Cal., for Group II Distributors.
 
 
 4
 Joel Linzner, Khourie, Crew & Jaeger, San Francisco, Cal., for United Artists Communications, Inc.
 
 
 5
 Charles B. Cohler, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for The Nickelodeon Corp.
 
 
 6
 Appeal from the United States District Court for the Northern District of California.
 
 
 7
 Before CHAMBERS and WIGGINS, Circuit Judges, and BREWSTER*, District Judge.
 
 BREWSTER, District Judge:
 
 8
 The Movie 1 & 2 ("The Movie") appeals a district court judgment dismissing its case against numerous antitrust defendants. This case involves allegations that two motion picture exhibitors in Santa Cruz, California, entered into an illegal film licensing agreement in which 19 national film distributors participated, and that the exhibitors attempted to monopolize, conspired to monopolize, and did monopolize the film exhibition market in Santa Cruz. The United States District Court for the Northern District of California, excluding from evidence certain statements offered by The Movie that the court deemed inadmissible, granted the defendants' multiple motions for summary judgment as to all of the antitrust claims.
 
 
 9
 We reverse and remand as to all of the remaining defendants the district court's grant of summary judgment, finding that: (1) the court erred in excluding the appellant's proffered evidence; (2) a genuine issue of material fact exists as to whether the exhibitor United Artists Communications, Inc. ("UA") and the Group I distributors participated in an illegal split agreement in violation of section 1 of the Sherman Act, precluding summary judgment; and (3) a genuine issue of material fact exists as to whether the exhibitors attempted to monopolize, conspired to monopolize, or monopolized the Santa Cruz exhibition market in violation of section 2 of the Act, precluding summary judgment.
 
 I. BACKGROUND
 
 10
 Appellant The Movie is a general partnership consisting of Harold Snyder and his two sons, David and Larry Snyder. In February of 1984, the Snyders opened a motion picture theatre in Santa Cruz, California. The two-screen theatre, which has 225 seats in each auditorium, is located in downtown Santa Cruz in a converted storefront which it shares with a moped shop. The Snyders' intent was to exhibit both "commercial" and "art" films on a first-run basis.
 
 
 11
 The exhibitor defendants in this case were two of The Movie's competitors, UA, which operates five theatres in Santa Cruz with a total of twelve screens, and the Nickelodeon, which operates two theatres with a total of four screens. The distributor defendants included ten major motion picture distributors ("Group I") and nine smaller independent distribution companies ("Group II").[1]
 
 
 12
 The relevant geographic market in this case is the greater Santa Cruz area, which includes Aptos, Scotts Valley, and Capitola. The relevant product market is first-run motion pictures. Although theatres can either show "first-run" films or subsequently run "sub-run" films, first-run films provide the greatest grossing potential. The Santa Cruz area has only ten theatres at present. UA's five theatres exhibit primarily first-run "commercial" films. The Nickelodeon's two theatres exhibit primarily first-run and vintage "art" films.[2] The only other competitors in Santa Cruz are two non-defendant independent exhibitors who apparently show primarily sub-run films.
 
 
 13
 The appellant alleges that The Movie was unable to obtain licenses to first-run commercial or art films from the defendant distributors, who concertedly refused to deal with it. Appellant alleges that the distributors cooperated in an illegal "split agreement" between UA and the Nickelodeon, whereby nearly all first-run commercial films were licensed to UA and nearly all first-run art films were licensed to the Nickelodeon. A split agreement is an exhibitor agreement which divides a normally competitive market by allocating films to particular members with the understanding that there will be no bidding among members for licensing rights to the films assigned. Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 576 (9th Cir.1986).
 
 
 14
 Appellant alleges that the split agreement in this case was part of a boycott against The Movie, which had the purpose of eliminating it as a competitor, a restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982). Appellant also alleges that UA maintained a monopoly on first-run commercial film exhibition and that the Nickelodeon maintained a monopoly on first-run art film exhibition, in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2 (1982).
 
 
 15
 On December 22, 1987, the district court, after excluding several items of evidence which it deemed inadmissible, granted the defendants' multiple motions for summary judgment as to both the section 1 and section 2 claims and relinquished its jurisdiction of the pendent state claims.
 
 II. STANDARD OF REVIEW
 
 16
 In reviewing a grant of summary judgment, our task is identical to that of the trial court. Viewing the evidence de novo in the light most favorable to the party against whom summary judgment was granted, we must determine whether the trial court correctly found that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. Whittaker Corp. v. Execuair Corp., 736 F.2d 1341 (9th Cir.1984). Our review of the trial court's rulings on the admissibility of evidence is plenary where the rulings call for the application of a legal standard, as opposed to a factual determination. In re Japanese Electronic Products, 723 F.2d 238, 257 (3rd Cir.1983), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also Whittaker, 736 F.2d at 1347.
 
 
 17
 Summary judgment is disfavored in complex antitrust litigation. The Supreme Court, in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), stated:
 
 
 18
 We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.
 
 
 19
 Although Poller does not preclude summary judgment in the proper antitrust case, it does advise caution. Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 680 (9th Cir.1985). Summary judgment is appropriate only in the clear absence of any significant probative evidence tending to support the complaint. Theee Movies of Tarzana v. Pacific Theatres, Inc., 828 F.2d 1395, 1398 (9th Cir.1987), cert. denied, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).
 
 III. DISCUSSION
 A. THE TRIAL COURT'S EXCLUSION OF EVIDENCE
 1. The Chiarrapotti Statements
 
 20
 The appellant argues that the trial court erred in excluding from evidence Hal and David Snyder's deposition testimony of a statement purportedly made by Al Chiarrapotti, distributor Twentieth Century Fox's employee in charge of licensing films to Santa Cruz exhibitors. The Snyders both testified in substance that Chiarrapotti had stated to them that he did not count theatre seats in Santa Cruz because there was a split of product between exhibitors in Santa Cruz, so that Fox did not take bids there. The defendants filed a declaration of Al Chiarrapotti denying that he had made this statement. The trial court held that this evidence was "inadmissible and contradicted hearsay from a third person." The Movie 1 & 2 v. United Artists Communications, 681 F.Supp. 654, 658 (N.D.Cal.1987).
 
 
 21
 First, appellees argue that the issue of the Chiarrapotti statements was not preserved for appeal since plaintiffs did not address defendants' explicit objections to admission of the statements either in their memorandum in opposition to the motions for summary judgment or in their oral argument at the summary judgment hearing. Appellees contend, therefore, that the correct standard for this particular question is plain error under Federal Rules of Evidence 103(d), due to appellant's failure to respond to appellee's objections to the evidence at the time it was excluded at trial. Appellees fail to note, however, that Rule 103(d) does not apply where, as here, the evidence was made known to the court.[3] Fed.R.Evid. 103(a)(2). Therefore, the correct standard for this court to apply is one of de novo review.
 
 
 22
 Under the de novo standard, this court finds that the district court erred in excluding this statement as inadmissible hearsay, at least as to appellee distributor Fox. The statement, which was made by a former licensing agent for Fox, was an admission by a party opponent under Fed.R.Evid. 801(d)(2). Rule 801(d) states that an admission by a party opponent is not to be treated as hearsay. Since, in deciding a summary judgment motion, all inferences are to be viewed in the light most favorable to the non-moving party, and since this evidence would likely have been admissible at trial, the court should have considered the statement in making its summary judgment determination.
 
 
 23
 Appellees next argue that the plaintiff failed to demonstrate that the statement qualified under Rule 801(d)(2)(D) as a statement by a party's servant concerning a matter within the scope of the employment, made during the existence of the relationship. The status of Mr. Chiarrapotti, however, was never in dispute. He was contacted by the Snyders because of his agency relationship, and the whole subject of their conversation concerned the possibility of doing business with appellee Fox, the principal of Mr. Chiarrapotti. There is no merit to appellee's position regarding the agency relationship of Mr. Chiarrapotti at the time of the alleged statements.
 
 
 24
 Furthermore, appellees argue that in order to admit the evidence against any defendant other than Mr. Chiarrapotti's employer, the statements must qualify under Fed.R.Evid. 801(d)(2)(E) as a statement by a co-conspirator made during the course and in furtherance of a conspiracy. The statements could be understood as supporting and furthering the split agreement. Since the statements, however, seem to apply only to appellees Fox and the exhibitors UA and Nickelodeon, this court concludes that the statements would be admissible, at least as to appellees Fox and UA. Such evidence of the split agreement would bear on both the section 1 and 2 claims of plaintiff.
 
 2. The Raney Statements
 
 25
 The appellant presented to the trial court the deposition testimony of the Nickelodeon's owner, Mr. Bill Raney, in which Raney stated that during the 1970's there was a split agreement between UA and a previous Santa Cruz exhibitor, Kindair, to allocate films, so that neither party competed against the other in bidding. UA subsequently purchased Kindair's Santa Cruz theatres. The trial court excluded this evidence, stating: "Plaintiff has no standing to complain of this previous split which occurred before its entry onto the market and did not produce any antitrust injury to The Movie." The Movie 1 & 2, 681 F.Supp. at 658.
 
 
 26
 The appellant, however, did not offer this evidence in an attempt to recover for antitrust injury resulting from the alleged split between UA and Kindair prior to The Movie's entry into the market. Rather, appellant was attempting to demonstrate previous anti-competitive conduct by defendant UA. Evidence of prior wrongs or acts may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" under Federal Rule of Evidence 404(b). See also, Whittaker, 736 F.2d at 1347.
 
 
 27
 At oral argument, appellant argued to the trial court that this testimony should be admitted to give an historical perspective of the anti-competitive atmosphere in the Santa Cruz exhibition market. The defendants objected to the testimony as hearsay, since it was based on statements allegedly made to Raney by Lou Lencioni, a UA employee. However, Lencioni's statements, like Chiarrapotti's, were statements by a party-opponent and, therefore, were not hearsay under the Federal Rules of Evidence. This testimony should have been considered by the trial court in deciding the motions for summary judgment.
 
 
 28
 Furthermore, appellees now argue that the testimony only evidences common legitimate business practices, with no suggestion of any illegal activity. Although Mr. Raney characterized the track system as a "split," appellees argue that he used the term in a generic sense, and his choice of words was not meant to bear any legal significance. Nevertheless, the statements were relevant and admissible. Appellee's argument only addresses the weight to be given to them, which is a task for the jury.
 
 
 29
 B. SECTION 1 CLAIMS: AGREEMENT IN RESTRAINT OF TRADE
 
 
 30
 Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. Sec. 1 (1982). Appellant's section 1 claims allege an illegal agreement between the exhibitors and the distributors in the form of a "group boycott" aimed at excluding The Movie from the Santa Cruz theatre market.
 
 
 31
 The Supreme Court has emphasized, however, that the Sherman Act does not restrict "the long recognized right of a trader ... engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Because of a supplier's right to choose his customers and set his own terms, "antitrust plaintiffs are required to do more than merely allege conspiracy and unequal treatment in order to take a case to trial." Harkins Amusement Enterprises v. General Cinema Corp., 850 F.2d 477, 483 (9th Cir.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989). According to the law of this circuit, once a defendant rebuts the allegations of conspiracy with "probative evidence supporting an alternative interpretation of a defendant's conduct," the plaintiff must come forward with specific factual support of its conspiracy allegations to avoid summary judgment. Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 680 (9th Cir.1985).
 
 
 32
 The defendants in this case did offer some evidence from which a trier of fact could reasonably have found that their refusal to deal with The Movie was based on legitimate and sound business judgment. Following such a showing of a plausible and justifiable reason for a defendant's conduct, a plaintiff must provide specific factual support for its allegations of conspiracy which tends to show that the defendant was not acting independently. Accordingly, we examine appellant's evidence in support of its conspiracy allegations.
 
 1. The Distributor Defendants
 
 33
 The distributors possessed an absolute right to refuse to license films to The Movie as long as their decisions were based upon independent business judgment. Colgate, 250 U.S. at 307, 39 S.Ct. at 468. The distributors presented evidence to the trial court from which a trier of fact could find that the decision to license films to UA and the Nickelodeon rather than to The Movie was based on such factors as the perceived inferiority and consequently lower grossing potential of The Movie's theatre house and the allegedly inferior terms offered in The Movie's bids. Thus, under Barnes, the defendants rebutted the allegations of conspiracy, and it was incumbent upon the plaintiff to come forward with specific factual support of its conspiracy claim. We believe the plaintiff did present ample evidence to rebut defendants' evidence of independent business decisions and to support plaintiff's allegations of an illegal boycott. We, therefore, reverse the trial court's summary adjudication of the section 1 claims against all of the Group I distributor defendants.
 
 
 34
 Appellees contend that the lower court's record contained no admissible evidence or assertion of any defendant distributors' having received superior bids from The Movies and having rejected them in favor of defendant exhibitors. Appellees fail to recollect the exhibits N-1 through N-16 to the declaration of Larry Snyder in opposition to defendants' various motions for summary judgment. While it could be argued, as appellees also urge here, that none of the appellant's bids were superior, that determination is an issue of fact which should be decided by summary judgment only if the trial court can find that no reasonable jury could find on that question in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Some of the bids were arguably superior.[4]
 
 
 35
 There was evidence before the trial court indicating that these distributors had refused to even receive bids from The Movie until they received threatening correspondence from The Movie's attorney. The distributors have cited no legitimate business justification for a refusal to even receive an exhibitor's bid, nor can this court conceive of how such conduct could reflect sound business judgment. To the contrary, such behavior raises the inference that the distributors would not have licensed films to The Movie even if presented with consistent lucrative bids superior to those of the other exhibitors. This circuit has recognized that a distributor's repeated rejection of lucrative bids in an anticompetitive market environment raises an inference of conspiratorial antitrust conduct. See Harkins, 850 F.2d at 484. The evidence that UA reaped roughly 96.9% of all revenues from first-run commercial films shown in Santa Cruz reflects an anticompetitive market situation. In such an environment, the distributors' refusal to even receive a new exhibitor's bids "tends to exclude the possibility of independent action," and at least raises an issue of fact as to their participation in the alleged boycott.
 
 
 36
 This circuit has recognized that it is not necessary for a plaintiff to show an explicit agreement among defendants in support of a Sherman Act conspiracy, and that "concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings." Harkins, 850 F.2d at 477 (quoting Dimidowich v. Bell & Howell, 803 F.2d 1473, 1479 (9th Cir.1986). We conclude, therefore, that appellant did present sufficient evidence to present a triable issue on the section 1 claim of conspiracy to restrain trade in the form of a group boycott of appellant through split agreements. Our conclusion is reached in the context of evidence before the trial court of awards of films without any bids at all, bid negotiations excluding appellant, bid-tipping, adjustments to licensing agreements made to UA regularly, but to appellant rarely, if ever, and the statistics of film licenses awarded. The appellant should, therefore, have been allowed to proceed to trial on the section 1 claims against the Group I distributors. We accordingly reverse the trial court's grant of summary judgment as to these defendants.
 
 2. Defendant Exhibitor United Artists
 
 37
 The appellant also presented evidence to the trial court which raises a material issue of fact as to UA's participation in an agreement in restraint of trade. The Chiarrapotti and Raney statements, which the court erroneously excluded, provided some evidence in support of the allegations of UA's participation in an illegal split agreement. The absence of any evidence that UA and the Nickelodeon ever bid against each other for a film during the relevant period, as well as the pattern evidence indicating that UA had 96.9% of the revenue from first-run commercial films which played in Santa Cruz during the relevant period while Nickelodeon had 69.9% of the revenue from first-run art films shown during that period, provided further evidence in support of the allegations of participation in an illegal split agreement.
 
 
 38
 Appellees first argue that it is impossible to classify types of films. They admit, however, that the exhibitors in this lawsuit did differ in the types of films they preferred to play: the Nickelodeon specializing in foreign and more sophisticated subject films, UATC and Scotts Valley playing mostly general audience films. Appellees' contention, however, that no "pattern" existed besides the independent, legitimate business, and artistic decisions of the exhibitors misses the point. The question is not whether an individual exhibitor has the "right" to specialize; it cannot be disputed that every exhibitor has the right, and perhaps even laudable business acumen to "specialize" in one type of film, such as "art" or "commercial." The relevant inquiry, rather, is whether the defendant exhibitors conspired to exclude any and all other entrants into the movie exhibition market. For this, the statistical pattern evidence, along with other evidence, contributes to the raising of a material issue of fact.
 
 
 39
 Appellant further offered evidence of specific instances where UA advertised films prior to the completion of bidding, allegedly indicating confidence and ultimate knowledge that it would obtain the films. Although UA argues that it is a common practice in the film industry to obtain and display promotional posters for films that have not yet been licensed, UA offered no explanation for the evidence that, in addition to displaying posters, on at least one occasion it had placed an advertisement in a local newspaper advertising a film it had not yet been awarded.
 
 
 40
 Appellant also presented to the trial court a letter sent to Hal Snyder from The Movie's film buyer, documenting an instance where a non-defendant distributor had agreed to license a particular film to The Movie, assuring the film buyer that The Movie could have it because UA had shown no interest in the film in northern California. The distributor later informed The Movie that it was canceling its agreement in order to license the film to UA. This evidence suggests that UA wielded such power in the Santa Cruz market that a distributor would rather breach an agreement with The Movie than deny UA a film.
 
 
 41
 Viewing the above evidence and the inferences that may be drawn therefrom collectively and in the light most favorable to the appellant, we cannot say that there was an absence of any genuine issue of material fact. Therefore, UA was not entitled to prevail as a matter of law. The summary adjudication of the section 1 claims in favor of UA must be reversed.
 
 
 42
 3. Evaluation of the Unreasonable Restraint of Trade
 
 
 43
 Allegations Under the "Per Se" Rule or the "Rule
 
 
 44
 of Reason"
 
 
 45
 To the extent that the district court held that a split agreement should be evaluated under the rule of reason because it constituted a non-price restraint of trade, the court erred. It should have applied the illegal per se rule.[5]
 
 
 46
 This circuit has recently ruled on this issue. In Harkins, 850 F.2d at 486, we noted that per se treatment is appropriate "where joint efforts by firms disadvantage competitors by inducing suppliers or customers to deny relationships the competitors need in order to compete." We concluded that an alleged split agreement, if proven, would be illegal per se. Appellees dispute the appellant's reliance on Harkins on several grounds. First, they claim that the "per se rule" in that case was only dicta. Second, they claim that all cases finding per se treatment appropriate for a split agreement have demonstrated that the agreement was to depress film rentals to the distributors, eliminate guarantees to those distributors, or otherwise affect the terms of licensing for films, i.e., antitrust injury. Appellees contend that appellants have failed to even allege these factors. One of the cases relied on in Harkins, appellees point out, Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), supports the proposition that a per se analysis is not appropriate where no antitrust injury has been alleged. The United States Supreme Court in that case found that plaintiff failed to prove an antitrust violation when it demonstrated injury to itself but not to competition. Northwest Wholesale Stationers, 472 U.S. at 297 n. 9, 105 S.Ct. at 2621 n. 9.
 
 
 47
 In the instant case, however, the split agreement is allegedly employed to restrict entry of other exhibitors into the Santa Cruz market for any film. If so, such conduct would cause antitrust injury in the form of a boycott, a conspiracy in restraint of trade in violation of 15 U.S.C. Sec. 1. In fact, in Northwest Wholesale Stationers, 472 U.S. at 294, 105 S.Ct. at 2619, the court opined that in cases of group boycotts that directly or indirectly cut off necessary access to customers or suppliers, the per se rule applies because the likelihood of antitrust injury is clear.
 
 
 48
 On remand, the trial court should instruct the jury accordingly.
 
 C. SECTION 2 CLAIMS: MONOPOLIZATION
 
 49
 The section 2 monopoly claims in this case were directed only against the exhibitor defendants. Appellant alleged that UA attempted to monopolize, and did monopolize, the first-run commercial film market in Santa Cruz. Appellant also alleged a conspiracy between the two exhibitors to monopolize the market. The district court granted the exhibitors' motions for summary judgment as to all of the section 2 claims. As defendant Nickelodeon has since been dismissed from the case, we review the court's decision as to defendant exhibitor UA only.
 
 
 50
 Appellees argue that appellant has abandoned its attempt and conspiracy claims by not addressing them in its opening brief. While it is true as a general principle that issues not briefed by an appellant will be deemed abandoned and not considered on appeal, in this case The Movie did not abandon the claims, but gave them sufficient, albeit brief, mention.[6]
 
 1. Monopolization and Attempt to Monopolize
 
 51
 To establish monopolization under section 2 of the Sherman Act, a plaintiff must prove:
 
 
 52
 (1) Possession of monopoly power in the relevant market;
 
 
 53
 (2) willful acquisition or maintenance of that power; and
 
 
 54
 (3) causal antitrust injury.
 
 
 55
 Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 993 (9th Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 838 (1987).
 
 
 56
 To establish an attempt to monopolize, a plaintiff must prove:
 
 
 57
 (1) specific intent to control prices or destroy competition;
 
 
 58
 (2) predatory or anticompetitive conduct to accomplish the monopolization;
 
 
 59
 (3) dangerous probability of success; and
 
 
 60
 (4) causal antitrust injury.
 
 
 61
 Transamerica Computer Co., Inc. v. International Business Machines, 698 F.2d 1377 (9th Cir.), cert. denied, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).
 
 
 62
 a. Monopoly Power
 
 
 63
 Appellee UA asserts that appellant has presented no direct evidence of UA's alleged monopoly power. However, the Supreme Court has acknowledged that the existence of monopoly power "ordinarily may be inferred from the predominant share of the market." United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (finding that a market share of 87% could sustain a finding of monopoly power). This circuit has stated that, although market share does not alone determine monopoly power, market share is perhaps the most important factor to consider in determining the presence or absence of monopoly power. Pacific Coast Agric. Export Ass'n. v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir.1975), cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). Moreover, in that same case the court held that a market share as low as 45-70% may support a finding of monopoly power, if accompanied by other relevant factors. Pacific Coast, 526 F.2d at 1204. The appellant's showing that UA's gross revenues were as high as 96.9% of the first-run commercial film exhibition revenues in Santa Cruz, and that Nickelodeon's gross revenues were as high as 69.9% of the first-run art film exhibition revenues, at least raises an issue of fact as to the exhibitor UA's possession of monopoly power, particularly in light of the other evidence in the record of the exhibitors' power to exclude competition from the Santa Cruz market.
 
 
 64
 UA seems to have drawn this theory from this court's decision in Oahu Gas Service, Inc. v. Pacific Resources, Inc., 838 F.2d 360 (9th Cir.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), wherein we stated that "[s]ubstantial market power can persist only if there are significant and continuing barriers to entry." 838 F.2d at 366 (internal quotations omitted). UA argues that the relevant Santa Cruz market had no barriers to entry and that each film's distributor placed significant constraints on defendant's monopoly power. If borne out by the facts, this argument finds strong support in our recent decision in United States v. Syufy Enters., 903 F.2d 659 (9th Cir.1990). In Syufy, we explained that the absence of entry barriers is always relevant to, and often determinative of, questions of monopoly power, because "[i]f there are no significant barriers to entry ... any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods and personal services for less." At 664. At this point in the litigation, however, UA's arguments do no more than clash with the evidence offered by appellant that UA and Nickelodeon successfully excluded potential competitors from the Santa Cruz market. In light of the conflicting evidence on this issue, summary judgment was not appropriate.
 
 
 65
 b. Willful Acquisition or Maintenance of Power, Intent to Destroy Competition, Anticompetitive Conduct
 
 
 66
 The previously discussed evidence of the split agreement and alleged attempt to boycott The Movie from the market raises a question of fact as to whether UA willfully acquired or maintained monopoly power by engaging in predatory or anticompetitive conduct designed to destroy competition. Appellees, on the other hand, argue that the mere semblance of a split agreement is not enough to raise a question of material fact; they claim that appellant's failure to introduce any evidence that UA or any of the distributor defendants had a conscious commitment to a common scheme to achieve an unlawful objective, i.e., to boycott The Movie, justified granting summary judgment. In other words, appellees contend that in addition to proving that UA had agreed with Nickelodeon to refrain from bidding against one another, to maintain their action, plaintiff also was required to show that UA secured the cooperation of distributors in excluding plaintiff from the first run market.
 
 
 67
 Such is not the case. The showing of a possible split agreement is one piece of circumstantial evidence from which a jury may infer a willful acquisition or maintenance of monopoly power. Market share is another. The fact that UA acquired its prior competitor Kindair, thus eliminating its only serious competition in the market, is further evidence of anti-competitive conduct on the part of UA, albeit prior to the time of The Movie's entry into the market. Together, these pieces of evidence, particularly examined in the context of a highly anti-competitive environment, are sufficient to raise a material issue of fact as to whether UA willfully maintained monopoly power or engaged in anticompetitive conduct with the intent to destroy or discourage competition. While it may be true, as appellees contend, that the alleged discriminatory adjustments are common in the industry, and while it may also be true that appellant never presented evidence of monopolistic profits, the evidence discussed above suffices to raise a material issue of fact on this element of the section 2 claim.
 
 
 68
 c. Causal Antitrust Injury
 
 
 69
 Appellees argue that appellant has failed to address the threshold issue of antitrust injury: injury to interbrand competition in the relevant market. Whereas appellant's original complaint contained allegations that the distributor appellees agreed to boycott appellant who was a "price cutter" so as to eliminate price competition, that consumers were forced to pay higher prices to attend theaters, and that the availability of films in Santa Cruz was reduced, appellant has since abandoned those claims. According to appellees, the appellant admitted in depositions of H. Snyder that the quality or quantity of films being released in Santa Cruz has experienced no change, and that pricing to the consumer has not been affected by any conduct of appellees.
 
 
 70
 We find, however, that appellant offered sufficient evidence from which a trier of fact could conclude that The Movie suffered causal antitrust injury as a result of the exhibitors' alleged wrongful conduct. Since, under Harkins, a split agreement, if proved, would be illegal per se, no further demonstration is required to prove an anticompetitive effect. National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85, 103-04, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). Although an anticompetitive effect is presumed, however, a plaintiff must still show that its injury was caused by anticompetitive acts. Newman v. Universal Pictures, 813 F.2d 1519, 1522-23 (9th Cir.1987), cert. denied, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). Appellant accomplished this by alleging that it was cut off from access to the film supply necessary to allow it to compete.
 
 2. Conspiracy to Monopolize
 
 71
 The evidence discussed previously, which suggested the existence of a split agreement between UA and the Nickelodeon, acquiesced in by certain distributors, raises a question of fact as to whether UA engaged in concerted action in maintenance of its alleged monopoly power. Since such conduct, if proved, would violate section 2 of the Sherman Act, the trial court erred in granting the motion for summary judgment on the conspiracy claim.
 
 IV. CONCLUSION
 
 72
 The record indicates that the appellant presented specific facts to the trial court to support its section 1 claims against all appellees. It further appears that there was sufficient evidence in the record to support the section 2 claim against UA. We, therefore, reverse the district court's grant of summary judgment and remand these claims for trial.
 
 
 73
 REVERSED AND REMANDED.
 
 
 
 *
 Hon. Rudi M. Brewster, United States District Judge for the Southern District of California, sitting by designation
 
 
 [1]
 Since appellate oral argument, this court has dismissed The Nickelodeon, Warner Bros. Distributing Corporation, and all of the Group II distributor appellees from this case, pursuant to settlements among the parties
 
 
 [2]
 This circuit has recognized the existence of relevant submarkets within a product market. See Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 994 (9th Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 838 (1987) (recognizing "industry anticipated top-grossing films" as a relevant market, distinct from the general film market). We are satisfied with the appellant's division of the relevant market in this case into two categories, "commercial" and "art" films
 
 
 [3]
 Evidence of the Chiarrapotti statement was in the submitted deposition testimony of Harold Snyder at page 115, and the court's consideration of the statement is evidenced by its discussion in its opinion
 
 
 [4]
 See, for example, Exhibits N-1, N-4, N-6, N-7, and N-12 to the deposition of Larry Snyder in opposition to defendants' motions for summary judgment
 
 
 [5]
 Appellees contend that the district court referred to the rule of reason in mere dicta and, therefore, that the issue to which it referred cannot be the basis for a reversal. They argue that the district court never reached the question whether the rule of reason or the per se analysis should be used because both first require proof of an agreement, such as a split agreement, which the court failed to find. Since we find an issue of fact exists regarding the existence of a split agreement, we address the applicability of the "rule of reason" analysis
 
 
 [6]
 Opening Brief for Appellant at 47